**FIRE FIGHTERS ASSOCIATION, DISTRICT OF COLUMBIA, et al.**

v.

**Marion S. BARRY, et al.**

**Civ. A. No. 87–3186.**

United States District Court, District of Columbia.

July 13, 1990.

Lee Levine, Ross, Dixon & Masback, Washington, D.C., for plaintiffs.

George C. Valentine, Asst. Corp. Counsel, Washington, D.C., for defendants.

## OPINION

JUNE L. GREEN, District Judge.

This case pits two important societal interests against one another: the interest in maintaining an effective and efficient fire department against the free speech interests of allowing government employees to criticize the workings of that department without fear of punishment. The Washington, D.C. Fire Fighters Association and five individual District of Columbia firefighters are suing the Washington, D.C. Fire Department and various Fire Department officials, seeking monetary, injunctive and declaratory relief for alleged violations of their first amendment rights. The plaintiffs seek partial summary judgment on the issue of whether or not the enforcement of certain Fire Department regulations against the individual plaintiffs violated the First and Fifth Amendments of the United States Constitution. The defendants oppose plaintiffs' motion and have filed a cross-motion for summary judgment, claiming that application of these regulations to the plaintiffs did not result in any constitutional deprivation.

Upon consideration of the plaintiffs' motion and statement in support, defendant's opposition and cross-motion, plaintiffs' reply, both parties statements of material facts, supplemental filings, oral argument, the entire record, and for the reasons set forth below, the Court grants in part the plaintiffs' motion for partial summary judgment and denies the defendants' cross-motion for summary judgment.

### I. Factual Background

The backdrop to this litigation paints a scene of continuing negative publicity about the District of Columbia's Fire Department. Early in 1985 several news stories described brewing controversy in the D.C. Fire Department.[1] Much of the controversy centered on Fire Chief Theodore R. Coleman. But articles and press coverage focusing on the effectiveness of the Department's emergency and ambulance services, its affirmative action program, the safety of the Department's equipment, as well as general concerns over the Department's efficiency, discipline and morale continued to occupy the news through 1987 when the incidents at issue occurred. (*See* P.Ex. 16).

In response to the "negative news coverage", Chief Coleman organized the "Community Action Team" ("CAT"), a group of top-level managers in the Fire Department, to handle public information. P.Ex. 17; *See also* Defendants' Response to the Plaintiffs' Statement of Material Facts in Support of their Motion for Partial Summary Judgment ("Defendants' Response") at 8. Several top-level Fire Department and city officials also wrote to various TV and radio stations complaining of unjustified criticism of the Department and lack of professional standards in reporting about Fire Department controversies. P.Ex's 19–25.

It was in the context of this surrounding strife that the plaintiffs ran afoul of department regulations.

### A. *Incident Involving Individual Firefighters*

1. Captain Dowey, Firefighter Darmstead, Firefighter Dypsky, and the Bumper Sticker Incidents

In August 1987, plaintiff Clifton Dowey, Jr.[2] had specialized bumper stickers printed which bore the message, "D.C. Fire Department—It's Not Just a Job, It's a Joke Too!" Dowey sold the bumper stickers for $1.00 each and donated the proceeds of the sale to the Washington Hospital Burn Center Unit. Captain Dowey and firefighters William G. Darmstead and Gregory C. Dypsky each displayed one of the stickers on their privately owned vehicles.

On August 12, 1987, Firefighter Darmstead parked his vehicle on Fire Department property. When Defendant Battalion Chief Gamelia Jackson became aware of

---

1. Exhibits to Memorandum of Points and Authorities in support of Plaintiffs' Motion for Partial Summary Judgment ("P.Ex.") 16.

2. Plaintiff Dowey was at that time a captain and decorated veteran of the Fire Department.

the presence of the bumper sticker on Darmstead's vehicle, Jackson ordered that Darmstead either remove his vehicle from Department property or remove the bumper sticker. Darmstead complied immediately by moving his truck off Department property.

The following day, the same incident was repeated with Captain Dowey. He parked his automobile on Department property with the bumper sticker attached. Dowey was ordered by defendant Jackson to remove either the bumper sticker or his vehicle. Jackson told Dowey that he found the bumper sticker "offensive". Defendants' Response to Plaintiffs' Statement of Material Facts ("Defendants' Response") at 19, ¶ 79. Dowey followed Jackson's order and removed his vehicle.

Defendant Assistant Fire Chief Dixon discussed the incidents involving Darmstead and Dowey with defendant Chief Coleman. Both Dixon and Coleman were angry about the incidents. Coleman felt that the content of the message embarrassed and harassed members of the Department. P.Ex. 1 at 88. It was agreed that defendant Jackson would place both men on charges for violating Article VI, Section 3 (the "Bumper Sticker Regulation") of the Fire Department Order Book.[3]

The charges against both Darmstead and Dowey were referred to the Disciplinary Investigation Board ("DIB").[4] Following a review of the charges, the DIB recommended no further action be taken against either firefighter. However, defendant Dixon rejected this recommendation and ordered the charges be pursued. A hearing examiner found both men guilty of violating the department's Bumper Sticker regulation. Darmstead and Dowey were issued official reprimands by Dixon's successor, defendant Assistant Fire Chief Rayfield Alfred.

Captain Dowey also was transferred to a different post and his name removed from the list of captains able to serve as an Acting Battalion Fire Chief as a direct result of the bumper sticker incident.[5]

On August 26, 1987, plaintiff Gregory C. Dypsky parked his truck with one of Captain Dowey's bumper stickers affixed to the rear window, on public property behind a Fire Department building. That morning, Dypsky was ordered by defendant, Acting Captain Raymond D. Thomas, to remove his vehicle or remove the bumper sticker. Dypsky refused, pointing out that his truck was parked on public property. However, two days later when Captain William Hopkins ordered plaintiff Dypsky to remove the bumper sticker, Dypsky complied.

Thereafter, the Fire Department independently sought to determine whether the parking space used by plaintiff Dypsky was public or Fire Department property. In reports to Chief Coleman, both Captain Hopkins and Battalion Fire Chief Donald A. Scalise indicated that the area was, in fact, public space and both recommended that plaintiff Dypsky should not be charged with a violation of the Department's Bumper Sticker regulation.

Despite the recommendations, charges were brought against plaintiff Dypsky and the matter was referred to the DIB. The DIB concluded unanimously that Dypsky's truck was not parked on Fire Department property; therefore, he should not be charged under Article VI, Section 3 of the Order Book.

After receiving the DIB recommendation, defendant Dixon ordered that plaintiff

---

**3.** Article VI, Section 3 provides: Decals, stickers, etc. that may be construed as obscene, cause embarrassment or harassment of members shall not be displayed in or on Fire Department property. Privately owned vehicles displaying any of the above-mentioned decals, stickers, etc. shall not park on Fire Department property. Plaintiffs' Exhibit A.

**4.** The DIB is a trial board consisting of three officers. The board reviews the evidence against a Department member and makes a recommendation regarding disciplinary action. The Assistant Fire Chief has discretion to dismiss, modify or adopt the board's recommendation. A final appeal to the Fire Chief may be taken.

**5.** Plaintiff Dowey has been promoted subsequently to Battalion Chief.

Dypsky be charged instead with a violation of Article VI, Section 4 [6] of the Fire Department Order Book ("the Department Reputation Rule"), on the ground that Dypsky had engaged in conduct "prejudicial to the Department's reputation, order or discipline", by displaying the bumper sticker. Plaintiffs' Statement at 21; Defendants' Response at 21. The charges were dated August 26, 1987, the date of the incident, and again referred to the DIB. The DIB once again recommended unanimously that the charge against plaintiff Dypsky be dropped. However, defendant Dixon also rejected this recommendation and ordered the charge be pursued. The disciplinary action against plaintiff Dypsky remains pending.

### 2. Firefighter Ricker

On August 25, 1987, while on duty, plaintiff Gregory A. Ricker telephoned a television reporter for WJLA–TV from a public phone located in the fire station. Ricker agreed to be interviewed about his opinions on the safety of the Latex gloves worn by firefighters treating trauma victims.[7] Ricker informed the reporter, however, that pursuant to Department policy, she would need to obtain permission from the Department's Public Affairs Officer, defendant Rayfield Alfred, before he could be interviewed on camera. Defendants' Response at 11.

Defendant Alfred denied permission for the televised interview. Later that day, Assistant Fire Chief Howard E. Dixon, on the order of defendant Coleman, suspended Ricker without pay until further notice,[8] on the ground that Ricker had violated Memorandum No. 38 [9] of the Department Regulations by granting an interview while on duty without receiving prior permission.

The next day, while on suspension and out of uniform, plaintiff Ricker visited the Fire Department Training Academy. He had read a report in *The Washington Post* newspaper that the Department had conducted safety tests on the Latex gloves, and he desired to inquire as to the results of those tests.[10] When Ricker arrived in the office of the Department Safety Officer, he found a television reporter and cameraman from WJLA–TV interviewing the Officer about the outcome of the glove tests. The reporter approached Ricker and asked him to comment on the safety of the Latex gloves. Ricker agreed to be interviewed and arranged to meet the reporter off Fire Department property. The interview was conducted a short while later at a bus stop nearby.

Upon learning that plaintiff Ricker had participated in this interview, defendant Howard E. Dixon, the Assistant Fire Chief, ordered a "special report" be written about

---

**6.** The relevant language of Article VI, Section 4 provides: "Members [of the Department] shall refrain from conduct prejudicial to the Department's reputation, order, or discipline."

**7.** At the time, members of the fire department were concerned that the gloves did not protect them adequately from exposure to infectious diseases. P.Ex. 5 at 48; Exhibit to Defendants' Memorandum of Points and Authorities in Support of Cross–Motion for Summary Judgment/and in Opposition to Plaintiffs' Motion for Summary Judgment ("D.Ex.") H. *The Washington Times* had run a story approximately one month earlier about firefighters who had been splashed by the blood of an emergency victim who they mistakenly believed had AIDS. P.Ex. 16; D.Ex. Z. Lieutenant Joseph Herr, in an interdepartmental memorandum to Chief Coleman, advised that during the incident reported by *The Washington Times* the Latex gloves had failed to protect two firefighters from exposure to the victim's blood. Herr rec-

ommended discontinuing use of the brand of gloves which had proved defective. D.Ex. I.

**8.** Plaintiff Ricker's pay was later restored. Defendant's Response at 11, ¶ 43.

**9.** The relevant portions of Memorandum 38 state:

[N]either officers or [sic] members of the Department are permitted to give interviews while on duty without prior written permission from The Public Affairs Officer. Hence, all requests for interviews should be directed to his attention.

Defendants' Exhibit A.

**10.** Defendants deny that plaintiff Ricker went to the Department Training Academy for the express purpose of inquiring about the glove tests results. However, defendants do not offer an alternative explanation for Ricker's presence at the Academy. In any event, this is not a material factual dispute.

the incident.[11] Ricker was cited for a second violation of Memorandum 38. The charges against plaintiff Ricker, outlined in the "special report", have now been referred to the DIB and remain pending.

### 3. Firefighter Lee

On September 3, 1987, one week after the incident involving plaintiff Ricker, plaintiff Brian K. Lee, dressed in jogging clothes, went, during his off-duty hours, to the Department's Training Academy. A television crew from station WUSA–TV was there, with the Department's permission, filming a segment on the Fire Department's Cadet Program. Lee spoke to a station representative about the program. He expressed his personal opinion that the program was excellent in theory but was discriminatory in practice because only students from local public high schools were eligible.

Defendant Lieutenant Philip Proctor is responsible for administering the Fire Department Cadet Program. He was participating in the interview by WUSA–TV, and overheard some of Lee's comments. On orders from Deputy Chief Dixon, defendant Proctor prepared a "special report" on plaintiff Lee's statements.[12] Defendant Matthews endorsed the report and cited plaintiff Lee with violation of Article III, Section 7 of the Department's Rules and Regulations.[13] Defendant Dixon referred the charge against Lee to the DIB; the matter is still pending.

### DISCUSSION

### I. Summary Judgment

■ Both the plaintiffs and the defendants seek summary judgment in this case.

Summary judgment may be granted if the movant demonstrates through affidavits, depositions and other admissions on file that "there is no genuine issue as to any material fact and that ... [the movant] is entitled to judgment as a matter of law." Rule 56(c), F.R.Civ.P. Both parties here argue that no material factual disputes exist in this case. The Court agrees with that conclusion. While the defendants do dispute some of the plaintiffs' factual characterizations, these disputes do not affect the outcome of the case under the law; therefore, they are not material. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

Plaintiffs and defendants both argue that they are entitled to a judgment under the law of the case. In the discussion which follows, the Court sets forth the reasons for its conclusion that *only* the plaintiffs are entitled to summary judgment. The Court shall consider first, whether any of the individual plaintiffs' constitutional rights were violated by the application of Fire Department regulations to their conduct. Then, the Court will consider further the plaintiffs' arguments that the Fire Department Regulations at issue are facially unconstitutional.

### II. Constitutional Challenge to the Regulations As Applied—The Bumper Sticker Incidents

#### A. *Pickering* and its Progeny

■ Public employees are not subject to a watered down version of first amendment protection. *Garrity v. New Jersey*, 385 U.S. 493, 500, 87 S.Ct. 616, 620, 17 L.Ed.2d 562 (1967). A public employee can-

---

**11.** Plaintiffs' Statement of Facts explains that: "A 'special report' is a memorandum addressed to Chief Coleman, which, in the context of disciplinary action, cites employees for the violation of the Department's rules, regulations and orders. The report is endorsed by superior officers in the chain of command up to and including the Assistant Fire Chief, the Department's second-in-command. Each endorsement contains that officer's recommendations to the Fire Chief." Plaintiffs' Statement of Material Facts in Support of their Motion for Partial Summary Judgment ("Plaintiffs' Statement") at 13, n. 9.

**12.** In the report, Proctor advised that "we would all be better served if our comments were positive or at least constructively negative." P.Ex. 28.

**13.** The plaintiffs do not challenge the substance of Article XI, Section 4 which states, "Members shall familiarize themselves with their duties, responsibilities, limits of authority, and official rules, regulations and orders."

not be forced to forfeit the speech rights he possesses as a private citizen as a condition of employment. *Keyishian v. Board of Regents*, 385 U.S. 589, 605–06, 87 S.Ct. 675, 684, 17 L.Ed.2d 629 (1967). However, "the government, federal or state, has a significant interest, 'as an employer in regulating the speech of its employees' in order to perform its public services effectively." *American Postal Workers Union v. U.S. Postal Services*, 830 F.2d 294, 300 (D.C.Cir. 1987), *quoting, Pickering v. Board of Education*, 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). When the interests of the public employee in speaking and the interests of the government in controlling that speech conflict a court must weigh one against the other to determine which interest is controlling. *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968).

The Supreme Court, in a series of cases, has laid out the balancing test to weigh these competing interests. In *Pickering*, a case involving the discharge of a public school teacher for his comments published in a local newspaper, which criticized the local school board's funding decisions, the Court first set out the required balance. The Court found that the school teacher's interest in commenting on school funding issues to be presented to voters in an upcoming election, outweighed the government's interest in "promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1735.

Next, the Court refined the *Pickering* analysis in *Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). The Court held, in *Connick*, that the employee's speech *must* involve a matter of public concern to invoke the *Pickering* balancing test; otherwise, a court should not interfere with the management decisions of the government as an employer. *Id.* at 146, 103 S.Ct. at 1689.

Finally, in *Rankin v. McPhearson*, 483 U.S. 378, 107 S.Ct. 2891, 97 L.Ed.2d 315

(1987), the Court held that the firing of a sheriff's office employee for her statement in a private conversation with a co-worker, concerning the assassination attempt on then-President Ronald Reagan, violated the First Amendment of the Constitution. The Court looked to the context of Ms. McPhearson's statement in determining that it addressed a matter of public concern. *Id.* at 386–87, 107 S.Ct. at 2897–98. The Court then proceeded to balance the government's interests in the efficient operation of its offices and the integrity of its public image against the plaintiff's interest in free expression. Because the evidence failed to show any actual harm to the government's legitimate interests, the Court concluded that Ms. McPhearson's interests outweighed the government's. *Id.* at 389, 107 S.Ct. at 2899.

B. Application of *Pickering, Connick* and *Rankin* to this Case.[14]

1. Firefighters Dypsky, Darmstead and Dowey

■ To determine whether the expression of firefighters Dypsky, Darmstead and Dowey involved a matter of public concern, the Court must examine not only the actual words themselves, but also the context and manner of their expression. *Connick*, 461 U.S. at 147–148, 103 S.Ct. at 1690; *Rankin*, at 386–87, 107 S.Ct. at 2897–98. The plaintiffs insist that the context of their expression reveals its character as a matter of public concern. They contend that the bumper stickers which read, "D.C. Fire Department—It's Not Just A Job, It's A Joke, Too!" must be viewed in the context of the surrounding public controversy over Fire Department operations. Viewed in this light, plaintiffs argue, the bumper stickers reflect the plaintiffs' participation in the ongoing public debate.

In contrast, the defendants focus on the content of the bumper stickers, and the firefighters' individual motives for displaying them. The defendants argue that the

---

**14.** The disciplinary actions taken against the individual defendants, and the threat of further disciplinary action is sufficient to implicate a review under the *Pickering* line of cases. "The

first amendment is implicated whenever a government employee is disciplined for his speech." *Waters v. Chaffin*, 684 F.2d 833, 837 n. 9 (11th Cir.1982).

stickers' sole message is a firefighter's personal dissatisfaction with his job. And they contend that the plaintiffs, in displaying the bumper stickers, only sought to vent their individual frustrations.

Taken apart from the surrounding circumstances, the Court agrees with the defendants that the display of a bumper sticker so lacking in meaningful content does not involve expression on a matter of public concern. But the plaintiffs' actions cannot be divorced from their context. At the time that plaintiffs Dypsky, Darmstead and Dowey displayed the bumper stickers on their vehicles, the Fire Department was embroiled in ongoing public controversy. The Department had been the subject of many news stories questioning its efficiency and discipline. And a longstanding, public dispute over the ability of defendant Fire Chief Coleman to manage the Department effectively, continued to be waged. Other reports questioned the morale of the firefighters.

In this atmosphere, the plaintiffs' public display of the bumper stickers must be seen as expression which touches upon a matter of public concern. The bumper stickers' message conveys not only personal dissatisfaction, but also a loss of discipline and good order in the Fire Department. The fact that employees of the Fire Department would be willing to display such a disparaging comment suggests a low morale among the firefighters. Loss of discipline and order, low morale, even personal discontent among the employees of a fire department can affect the ability of the organization to fulfill its duties in

protecting the public safety. And the ability of a fire department to fight fires effectively, is obviously a matter of public concern. The plaintiffs' expression on these matters contributed to the public debate. Thus, the plaintiffs' display of the bumper stickers must be seen to address, at least in part, a matter of public concern.

However, the Court does not ignore the decidedly personal aspect to the plaintiffs' expression. Each of the firefighters testified at depositions that they were partly motivated by private dissatisfaction with their jobs.[15] Furthermore, the bumper sticker's message was neither specific nor especially informative to the public, and could be construed as merely a personal attack on the Department. The private aspect of the plaintiffs' expression must put in the balance when weighing the plaintiffs' interests in expression against the defendants' interest in regulating that expression. *Eiland v. City of Montegomery*, 797 F.2d 953 (11th Cir.1986), *cert. denied* 483 U.S. 1020, 107 S.Ct. 3263, 97 L.Ed.2d 762 (1987).[16] *See also A.P.W.U.*, 830 F.2d at 303, n. 8.

■ On the opposite side of that balance, the Court must include the government's increased interest in controlling activity in its workplace. *Connick*, 461 U.S. at 150–151, 103 S.Ct. at 1691–92.[17] The defendants assert that their interest in prohibiting the display of these stickers is in maintaining the order and discipline of the Department. Other courts have noted the gravity of this interest in the law enforce-

---

**15.** Firefighter Darmstead stated, "I was disgruntled with the management, I guess, of the Fire Department." P.Ex. E at 39. Firefighter Dypsky admitted to being amused by the bumper stickers. Captain Dowey said that he had the stickers printed because the job and morale on the job had changed over the past years. See Defendants' Opposition at 25.

**16.** In *Eiland*, a police officer challenged his demotion for posting a poem which criticized the mayor in the police station during an election year. The Eleventh Circuit decided that the lower court had erred in dividing the poem's two subjects (the Mayor's running of the city and the Mayor's relations with members of the

police department) and applying the *Pickering* balancing test to both parts. The Court stated:

> [I]t appears that in most instances speech of a public employee will have aspects or subjects that are worthy of paramount protection under the First Amendment, as well as aspects or subjects that are not worthy of such heightened protection. The task under *Pickering* is to balance those competing interests and to determine whether the employee's interests in the speech as a whole outweigh the public employer's interests.

*Eiland*, 797 F.2d at 957.

**17.** *See supra* at 1194–95 for discussion of government regulation of non-public fora.

ment setting.[18]

If this were simply a battle between competing theoretical interests, the Fire Department's heightened interest in maintaining good order in the Department would outweigh the plaintiffs' reduced interest in their expression. However, the Supreme Court has held that the harm to the governments' interests cannot be merely hypothetical. *Rankin,* 483 U.S. at 389, 107 S.Ct. at 2899. The defendants must show that the plaintiffs' acts in displaying the bumper stickers in some way harmed the government's legitimate interest in maintaining departmental discipline. *A.P.W.U.,* 830 F.2d at 303–305. This, the defendants have failed to do.

The only suggestion that the plaintiffs' expressions disrupted the daily routine of the Fire Department in any fashion, is the testimony of defendant Acting Battalion Chief Gamelia Jackson that unidentified firefighters "grumbled" about the message conveyed by the bumper sticker. D.Ex. F. However, this evidence is insufficient to show concrete harm to the defendants' interests. Employee complaints are a regular phenomena in any workplace. Occasionally, they can grow to a point where they disrupt, even paralyze an organization. But the Court finds nothing to suggest that the grumblings of the firefighters in defendant Jackson's battalion affected adversely the discipline and good order of the fire station.

The defendants dispute that a showing of concrete harm is required under *Rankin.* They assert that the Court of Appeals determined in *Hall v. Ford,* 856 F.2d 255 (D.C.Cir 1988), that neither *Rankin* nor *A.P.W.U.* necessitated such a showing. They further contend that the Court rejected the "concrete harm" requirement in *Hall* and held that it was no longer applicable to the *Connick* balancing test.[19]

This Court finds, however, that the defendants have misinterpreted the Court of Appeals decision in *Hall.* The Court there did not do away with the concrete harm requirement. Rather, it indicated that a court, in deciding whether concrete harm exists, is not limited to objective evidence presented by the government, but may draw reasonable inferences from the circumstances surrounding the event. *Id.* at 261. In *Hall,* the Court was considering Hall's appeal from the lower court's dismissal of his complaint. In its reply to the complaint, the defendant, the University of the District of Columbia, did not allege any actual harm to the university. Because the Court was limited to the pleadings in deciding the motion under Rule 12(b)(6), F.R. Civ.P., it was forced to draw its own inferences of what the evidence might show at trial. In contrast, here we have an assertion of actual harm to the defendants' legitimate interests in the discipline and order of the Fire Department. However, the Court had concluded that the evidence to

---

**18.** *Marshall v. City of Atlanta,* 614 F.Supp. 581, 583 (D.C.Ga.1984), ("operational efficiency and harmony among coworkers are critical to the effective operation of the Bureau of Fire Services ... lives are at stake when the Bureau is not effective"), *aff'd* 770 F.2d 174 (11th Cir.1984); *Bickel v. Burkhart,* 632 F.2d 1251, 1257 (5th Cir.1980) ("Because of the nature of firefighting, and its high stakes, operational efficiency and harmony among co-workers are critical."); *Janusaitis v. Middlebury Volunteer Fire Department,* 607 F.2d 17, 26 (2nd Cir.1979) ("When lives may be at stake in a fire, an esprit de corps is essential to the success of the joint endeavour."); *See also Waters v. Chaffin,* 684 F.2d 833, 839 (1982), for compilations of cases which hold that police departments, like fire departments, have greater interests in maintaining morale and discipline than the ordinary government employer.

**19.** Defendants point to the following paragraph in *Hall:*

 Although unadorned speculation as to the impact of speech, whether public or private, on the government's enterprise will not suffice under *Rankin,* and *APWU,* neither case forbids us from drawing reasonable inferences of harm from the employee's speech, his position, and his working relationship with his superior. *Connick,* for example, recognized that the employer need not "allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action." 461 U.S. at 152, 103 S.Ct. at 1692. Just as the employer may be permitted to infer these untoward consequences from the content, manner, time and place of the employee's speech, so may we.
 *Hall,* 856 F.2d at 261.

support this assertion is insufficient to show actual harm.

Furthermore, the plaintiff in *Hall* was a "prominent policy-level official" who belonged in "that narrow band of fragile relationships [between employer and employee] requiring for job security loyalty at the expense of unfettered speech." *Id.* at 264 (quoting District court opinion in same case). Because of Hall's status, the Court inferred reasonably that his public expression of disagreement with policy matters central to his responsibilities, undermined the University's legitimate interests in the efficient operation of its Athletic Department according to policy set by the President and the Board of Trustees. *Id.* at 265. None of the plaintiffs involved here qualifies as policy-level officials. Nor are their working relationships or the circumstances of their expression so special as to warrant an inference of disruption to Department operations. Thus, this Court is limited to the assertions put forth by the defendants, which it has found lacking. Anything further would be unadorned speculation of the type condemned by the Court in *Hall.*

### 2. Firefighter Ricker

 The interviews [20] given by Firefighter Ricker clearly involve a matter of public concern. Firefighters are in the business of protecting property from destruction and saving lives. The effectiveness of their equipment and their general safety and welfare are of crucial import to the society which they serve. Plaintiff Ricker's statements, which questioned the effectiveness of the latex gloves worn by D.C. firefighters, went to the core of a crucial public health concern: the potential exposure of a firefighter to a contagious disease, including the AIDS virus.[21]

 The governmental interest which the defendants assert outweighs plaintiff Ricker's interest in publicly commenting on this important safety concern, is the Fire Department's need for order and discipline. The defendants rely on the "para-military" context in which this case arises to conclude that the government's interest in "ensuring the troops obey the rules is sufficient interest to warrant discipline for violations of those rules." Defendants' Memorandum of Points and Authorities in Support of Cross–Motion for Summary Judgment/ and in Opposition to Plaintiffs' Motion for Summary Judgment ("Defendants' Opposition"), at 24.

The defendants' reliance is ill-placed, however. Other courts have struck down disciplinary actions taken against employees in a similar context. For example, in *Waters v. Chaffin,* 684 F.2d 833 (11th Cir. 1982), the Court held that the demotion of police officer who used profanity to refer to the police chief in a private conversation, while the officer was off duty and out of uniform, violated his first amendment rights. Even more germane to the present controversy is the First Circuit's decision in *Brasslett v. Cota,* 761 F.2d 827 (1st Cir. 1985), that a town fire chief could not be fired for his remarks concerning the *adequacy of the fire department's equipment* and the town's fire fighting capabilities. In both *Waters* and *Brasslett,* the courts found the government's evidence of disruption to the police department lacking. Similarly, here there is no suggestion of actual harm to the government's purported inter-

---

**20.** The defendants contend, and for the purposes of deciding motions for summary judgment the plaintiffs do not dispute, that the telephone call placed by plaintiff Ricker to station WJLA–TV on August 25, 1987 constituted an "interview" under Memorandum 38.

**21.** The Court finds incredible, the defendants' argument that a firefighter's complaint about the potential risk of exposure to this deadly disease ineffective equipment constitutes merely an employee grievance. Were the impact of plaintiff Ricker's concerns limited to a matter of employee safety, as the defendants suggest, the Court still would find his statement touched upon an important issue of public concern for the reasons mentioned above. However, firefighters who fear that their equipment will not protect them adequately from exposure to the AIDS virus may be hesitant to rescue and treat victims believed to carry the disease. Indeed, plaintiff Ricker testified at his deposition that other firefighters had expressed "sincere doubts as to whether they wanted to go out on the street anymore and deal with these patients because of the fear they had of becoming infected." P.Ex. 5 at 50. Such a consequence is a public concern of the utmost import.

est in order and discipline.[22] Ricker did not interrupt the performance of any of his daily duties to give the interviews. The first interview consisted of a short conversation on the telephone in which Ricker agreed to be interviewed on camera if the station complied with the licensing prerequisite of Memorandum 38. Thus, Ricker cannot be accused of disrupting the good order of the Department by violating a regulation with which he was attempting to comply. The second interview took place while Ricker was on suspension and arguably off Fire Department property.[23] Thus, there was no immediate disruption to the operations of the Department. Nor do the defendants suggest that Ricker's remarks causally affected the discipline of other firefighters.

### 3. Firefighter Lee

■ Like Firefighter Ricker, Firefighter Lee also expressed his views on an issue of public concern during an on camera interview. Lee's comments were about the potentially discriminatory impact of the Department's Cadet Program on its hiring practices. They were made in the context of an ongoing interview of a Department representative about the Cadet Program. There is also evidence in the record to suggest that Lee's comments were solicited by the television reporter conducting the interview. P.Ex. 7 at 55.

Given this context, the Court concludes that plaintiff Lee's expression touched upon a matter of public concern. The Cadet Program limits its enrollment to District of Columbia residents who have graduated from high school. Most of the candidates come from the predominately black public high schools. P.Ex. 4 at 258–59. Consequently, the Program affects the racial composition of the Department. The effect of this program, as well as other affirmative action programs, on the Fire Department are issues of public concern. *Rode v. Dellarciprete*, 845 F.2d 1195,

1201–02 (3rd Cir.1988) (issues concerning allegedly discriminatory hiring practices constitute matters of public concern).

■ Proceeding to the *Pickering* balancing test, the Court concludes that plaintiff Lee's interests outweigh the Fire Department's for reasons substantially similar to those affecting Firefighter Rickers' claim. Once again the defendants have failed to allege any actual harm to the discipline and good order of the Department. The only effect of Lee's expression which the defendants point to is the perception of the officer being interviewed at the time, that the reporter's questions took on "a more negative approach" after her conversation with plaintiff Lee. Defendants' Response at 15, ¶ 63.

The Court recognizes that the defendants also have an interest in preventing the dissemination of inaccurate information about the Department and its programs. However, the defendants have not shown that plaintiff Lee's expression implicated this interest. The Court is skeptical of the defendants' characterization of Lee's statements as "recklessly inaccurate speech". Defendants' Opposition at 28. Lee's assertion that the Cadet Program recruited exclusively from public high schools in the District was only slightly in error. In fact, defendant Dixon admitted in his deposition that to the best of his knowledge, all the cadets have come from the public school system. P.Ex. 4 at 258. Even assuming the defendants could substantiate this accusation at trial, a public employee's recklessly false statements may be protected speech absent a showing of actual and significant harm. *Brasslett*, 761 F.2d at 840–841; *See also A.P.W.U.*, 830 F.2d at 305–306.

The defendants do not allege actual and significant harm to any legitimate interests. Therefore, the Court concludes that

---

**22.** See discussion of requirement that government must show concrete harm to its state interests. *Infra* at 1191.

**23.** It is unclear whether Firefighter Ricker was charged with a second violation of Memoran-

dum 38 because he agreed to be interviewed while on Fire Department property or because he subsequently gave an interview off Fire Department property. However, the Court shall assume the latter basis for the disciplinary action against plaintiff Ricker.

the disciplinary action taken against Firefighter Lee, as well as the actions taken against Firefighters Dypsky, Darmstead, Dowey and Ricker, violate their first amendment rights. The Court will consider next the remaining claims of the plaintiffs' Fire Fighter Association challenging the facial validity of the disputed Fire Department regulations.

III. Are the Regulations Facially Unconstitutional?

A. *Memorandum 38 and Press Access Policy*

The plaintiffs contend that two Fire Department Regulations, Memorandum 38 and the so-called Press Access Policy, constitute unconstitutional prior restraints on the plaintiffs' free speech. The defendants insist that only Memorandum 38 is at issue. The defendants dispute the existence of the so-called Press Access Policy, arguing that at most it represents an interpretation of Memorandum 38 by certain Department officials.

However, the Court need not delve into the merits of this dispute. For the purpose of deciding the plaintiffs' motion for summary judgment, the Court must view the facts in a light most favorable to the party opposing the motion, in this case, the defendants. *Adickes v. S.H. Kress Co.,* 398 U.S. 144, 158–159, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970). Moreover, the dispute is irrelevant. Even assuming the Press Access Policy to be a mere gloss on Memorandum 38, this Court, under the analysis which follows, finds the regulation to be an unconstitutional prior restraint.

▇▇▇ The protection of the people against prior restraint of speech lies at the root of the first amendment. *Near v. Minnesota ex rel Olsen,* 283 U.S. 697, 713, 51 S.Ct. 625, 630, 75 L.Ed. 1357 (1931). The Supreme Court has declared that "prior restraints on speech and publication are the most serious and the least tolerable infringement on First Amendment rights." *Nebraska Press Assn v. Stuart,* 427 U.S. 539, 559, 96 S.Ct. 2791, 2803, 49 L.Ed.2d 683 (1976). Consequently, the Court has held that "any system of prior restraints of

expression comes to this Court bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan,* 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963).

▇▇▇ Regulations which condition the exercise of speech rights on the prior permission of a government official constitute a prior restraint. Where such regulations fail to include "narrow, objective and definite standards to guide the licensing authority", the Supreme Court has struck them down as facially unconstitutional. *Shuttlesworth v. City of Birmingham,* 394 U.S. 147, 151, 89 S.Ct. 935, 938, 22 L.Ed.2d 162 (1969). Similarly, when a regulatory scheme places "unbridled discretion in the hands of a government official" the Court has declared it an unconstitutional prior restraint. *City of Lakewood v. Plain Dealers Pub.,* 486 U.S. 750, 757, 108 S.Ct. 2138, 2143–44, 100 L.Ed.2d 771 (1988); Whenever possible, however, a court is to construe a statute or regulation so as to avoid a constitutional challenge if such a construction is possible. *Boos v. Barry,* 485 U.S. 312, 331, 108 S.Ct. 1157, 1169, 99 L.Ed.2d 333 (1988).

▇▇▇ Memorandum 38 requires that any interview given by a member of the Fire Department be pre-approved by the Public Affairs Officer. No standards guide the officer's decision to grant or deny a request. The officer is free to withhold permission based on his or her own criteria of what information should be released to the public. The officer need not even provide a reason for his denial. The vesting of such unbridled discretion in one Fire Department official, over the access of Fire Department employees to a free press, creates an unconstitutional prior restraint.

The defendants suggest that this line of reasoning is in error. They argue that the law of prior restraint applies only to government regulation of public fora; that a prior restraint does not offend the Constitution where, as here, the government seeks to regulate the speech and conduct of its employees at the workplace.

The Court acknowledges that the government has more extensive powers to regulate access to a non-public forum than to a public forum. For example, the Supreme Court has held that the government may discriminate on a viewpoint neutral basis, between political advertising and public service advertising when selling space for "car cards" on public buses. *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974) (plurality opinion). The government also may limit preferentially access to a public school's internal mail system by excluding a rival teachers' union where the exclusion is not based on the views of the rival union. *Perry Educ. Assn v. Perry Local Educators' Assn*, 460 U.S. 37, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). And in *Cornelius v. NAACP Legal Defense & Educ. Fund*, 473 U.S. 788, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985), the Court held that a federally organized charity drive aimed at federal employees was not a public forum; therefore, the government could exclude legal defense and political advocacy organizations from participating in the drive. Justice O'Connor, writing for the majority, stated, "[n]othing in the Constitution requires the Government freely to grant access to all who wish to exercise their right to free speech on every type of Government property without regard to the nature of the property or to the disruption that might be caused by the speaker's activities." *Id.* at 799–800, 105 S.Ct. at 3447 (citation omitted). The Court concluded that "the Government [as an employer] has the right to exercise control over access to the federal workplace in order to avoid interruption of the performance of the duties of its employees" so long as that control is exer-

cised in a view-point neutral manner. *Id.* at 806, 105 S.Ct. at 3451.

But, in this case, the government's enlarged interest in regulating its employees' expression must be weighed against the manner of restraint imposed by the regulation. In each of the aforementioned cases, the government's regulation banned certain speakers from access to government property. The regulations were upheld because they were reasonably related to legitimate governmental interests and were viewpoint neutral. *See, City of Shaker Heights*, 418 U.S. at 304, 94 S.Ct. at 2717; *Perry Educ. Assn*, 460 U.S. at 55, 103 S.Ct. at 960; *See also Cornelius v. NAACP Legal Defense & Educational Fund, Inc.*, 473 U.S. at 813, 105 S.Ct. at 3454 (Court left undecided the question whether the government in fact had excluded respondents impermissibly on the basis of their particular viewpoint.)[24] However, the Fire Department regulation at issue here provides no basis for the Court to determine whether or not a denial of permission to interview a Department employee is based impermissibly on the viewpoint which that employee wishes to express. Herein lies the evil of a prior restraint. A licensing law gives the government official substantial power to suppress disfavored speech or disliked speakers free from the scrutiny of neutral parties. *Lakewood*, 486 U.S. at 759, 108 S.Ct. at 2145. Unless the law contains "neutral criteria to insure that the licensing decision is not based on the content or viewpoint of the speech being considered", it threatens to violate rights protected by the first amendment. *Id.* at 760, 108 S.Ct. at 2145.[25]

**24.** The defendants also cite *May v. Evansville Vandesburgh School Corp.*, 787 F.2d 1105 (7th Cir.1986), for the principle that the workplace is for working and not for meetings or interviews which advance an employee's personal agenda. Defendants' Opposition at 10. But *May* involved a complete ban on the use of school property by employee meetings unrelated to school business. (The Court found that the plaintiff had abandoned her attempt to prove that the ban was directed solely at religious discussions.)

Memorandum 38, in contrast, is not a complete ban, but only a partial ban on interviews which the Department's Public Affairs Officer

deems improper. Indeed, the record reveals that the Department granted permission for interviews which it found favorable to its public image. Thus, *May* is not dispositive of the issues before this Court.

**25.** The defendants point out that courts have upheld prior approval requirements for military personnel seeking to circulate petitions on military bases. Defendants' Opposition at 7. In *Brown v. Glines*, 444 U.S. 348, 100 S.Ct. 594, 62 L.Ed.2d 540 (1980), the Supreme Court upheld the requirement because it found that military service requires "a respect for duty and a disci-

The Court's holding on this question is a narrow one. The Fire Department's Memorandum 38 must be struck down because it fails to provide "narrow, objective and definite standards" to guard against content-based determinations by the Public Affairs Officer. The Court is not indicating that the government may never regulate its employees access to the press. The government should be allowed to control the expressive activities of its employees in the workplace when its employees' expression may cause disruption. But where the government chooses to limit its employees speech by vesting in one official the power to determine in advance who shall have access and who shall not, that power must be bounded by precise and clear standards. Memorandum 38 fails to provide these standards, and for this reason, it cannot survive a constitutional challenge.

B. *The Bumper Sticker Regulation and the Departmental Reputation Rule*

The plaintiffs also raise facial challenges to the remaining Fire Department Regulations. The plaintiffs challenge the Department's Bumper Sticker Regulation and the Departmental Reputation Rule on grounds that they are both void for vagueness and impermissibly overbroad. They argue that neither regulation provides firefighters with fair notice of the proscribed conduct; also, that the terms of each regulation are incapable of objective definition. The plaintiffs contend that, as a result, the Department may proscribe a broad range of constitutionally permissible expression under these regulations.

The Court agrees with the plaintiffs' contention that the Department's Bumper Sticker Regulation is facially invalid. It finds that the regulation is both overbroad and viewpoint based. However, the Court finds that the Departmental Conduct Regulation is valid on its face.

1. The Bumper Sticker Regulation is Overbroad and Viewpoint Based.

 Under the due process clause of the fourteenth amendment, a law must be drafted with sufficient clarity to "give fair notice of the offending conduct." *Papachristou v. City of Jacksonville*, 405 U.S. 156, 162, 92 S.Ct. 839, 843, 31 L.Ed.2d 110 (1972). Laws which by their terms are susceptible to widely ranging interpretations encourage arbitrary and discriminatory application. *Id.* Likewise, overbroad regulations lend themselves to discriminatory enforcement and can chill the exercise of protected first amendment rights. *Thornhill v. Alabama*, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940). Thus, when a regulation lacks terms which can be defined objectively, a court will strike it down for vagueness. *Keyishian v. Board of Regents*, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967). And where the regulation touches on expression protected by the first amendment, Courts require an even greater degree of specificity to withstand a vagueness challenge. *Smith v. Gougen*, 415 U.S. 566, 573, 94 S.Ct. 1242, 1247, 39 L.Ed.2d 605 (1974). Similarly, when a law or regulation prohibits a substantial amount of protected conduct in addition to the targeted, unprotected conduct, it is deemed overbroad in violation of the first amendment. *See Grayned v. City of Rock-*

---

pline without counterpart in civilian life." *Id.* at 354, 100 S.Ct. at 599 (*quoting Schlesinger v. Councilman*, 420 U.S. 738, 757, 95 S.Ct. 1300, 1312, 43 L.Ed.2d 591 (1975)) (citation omitted); *See also Carlson v. Schlesinger*, 511 F.2d 1327 (D.C.Cir.1975). Furthermore, regulations which implemented the requirement limited its to petitions which posed "a clear danger to military loyalty, discipline, or morale." *Glines*, 444 U.S. at 355, 100 S.Ct. at 600. Therefore, the Court found that the Army policy restricted speech no more than was reasonably necessary to protect substantial government interests." *Id.*

The Court is not persuaded that the defendants' analogy to the military context is apt.

While fire and police departments often are referred to as para-military associations, these organizations do not demand rigorous and unquestioning duty in the degree required by the military. And other courts have rejected the military—civilian law enforcement analogy "as too inexact to have utility when a determination of constitutional rights is at issue." *Bence v. Breier*, 501 F.2d 1185, 1192 (7th Cir.1974) (*citing Muller v. Conlisk*, 429 F.2d 901, 904 (7th Cir. 1970)), *cert. denied* 419 U.S. 1121, 95 S.Ct. 804, 42 L.Ed.2d 821 (1975). Moreover, unlike the Army Directive in *Glines*, Memorandum 38 is not bounded by any limiting regulations which narrow its reach.

*ford,* 408 U.S. 104, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

 The Court finds that the Fire Department's Bumper Sticker Regulation is both impermissibly vague and overbroad. It prohibits firefighters while on Fire Department property from displaying bumper stickers or decals which may cause embarrassment or harassment of Department members. But these terms escape objective definition and consequently, sweep a substantial amount of protected speech under the regulation's prohibition. A firefighter seeking to comply with the regulation is not sure, for instance, whether a bumper sticker carrying the message "D.C. Firefighters for Gay Pride" would subject his fellow firefighters to embarrassment or harassment. Indeed, the Court can imagine many stickers which comment on controversial issues that might embarrass or cause harassment of Department members.[26] Even stickers which address issues important to the Department, as well as the public would fall under the regulation's broad sweep. (*e.g.* a sticker which reads "D.C. Fire Department Needs More Money" or "a New Fire Chief").

 Furthermore, the regulation discriminates between the bumper stickers which firefighters seek to display based on the viewpoint expressed. Stickers and decals which support the Department's views are unlikely to be determined embarrassing or harassing to members. On the other hand, stickers which oppose the Department's views or make light of the Department, such as those displayed by the plaintiffs, are condemned by the regulation. As the Court previously indicated, regulations which are not viewpoint neutral cannot survive constitutional scrutiny, even when they purport to regulate a non-public forum, such as a government workplace. *See* text *infra* at 1194–95.

26. For example, stickers which address a firefighter's support of issues such as abortion or drug legalization or even political association, to name a random few.

27. The first clause of the regulations prohibits bumper stickers and decals which are obscene. Obviously, this clause does not violate the Constitution because obscenity is not protected by

Nor does the Court find any way to construe the challenged regulation so as to eliminate the offense to the first amendment.[27] Thus, the Department's Bumper Sticker Regulation must be struck down in whole.

2. The Departmental Reputation Rule in Neither Vague nor Overbroad.

 Several other courts have upheld facial challenges to "catch-all" provisions similar to the one found in Article VI, Section 4 of the Fire Department's Order Book. *See Davis v. Williams,* 617 F.2d 1100, 1101 (5th Cir.1980) (upholding regulation permitting discharge for "conduct prejudicial to [the] good order" of the fire department), *cert. denied* 449 U.S. 937, 101 S.Ct. 336, 66 L.Ed.2d 160; *Bickel v. Burckhart,* 632 F.2d 1251, 1254 (5th Cir 1980); *Janusaitis v. Middlebury Volunteer Fire Dept.,* 607 F.2d 17, 19 (2nd Cir.1979) (upholding regulation prohibiting "unbecoming conduct detrimental to the welfare or good name of the department"); *Kannisto v. City and County of San Francisco,* 541 F.2d 841, 842 (9th Cir.1976), (upholding regulation prohibiting "misconduct or any conduct ... which tends to subvert the good order, efficiency and discipline ... or which reflects discredit upon ... or that is prejudicial to ... efficiency and discipline"), *cert. denied,* 430 U.S. 931, 97 S.Ct. 1552, 51 L.Ed.2d 775 (1977). Most notably, the Supreme Court in *Arnett v. Kennedy,* 416 U.S. 134, 158, 94 S.Ct. 1633, 1646, 40 L.Ed.2d 15 (1974), upheld a provision authorizing the suspension or dismissal of a government employee "for such causes as will promote the efficiency of the service". The Court construed the statutory provision to exclude constitutionally protected speech. The Court then held that the provision was directed at employee conduct not speech, and in fact, was designed to

the first amendment. The Court declines to sever the rest of the regulation from this clause because, in the Court's view, this would change materially, the meaning of the regulation. The Fire Department, of course, is free to promulgate a new regulation which only prohibits obscene stickers.

limit the government's discretion in discharging federal employees. *Id.* at 158, 159, 94 S.Ct. at 1646, 1646. The Court found the provision, as limited, did not violate constitutional principles of vagueness and overbreadth. *Id.* at 159, 94 S.Ct. at 1646.

*Arnett* controls the Court's determination that the Departmental Reputation Rule is neither vague nor overbroad. The operative language in the rule is the provision which mandates: "Members [of the Department] shall refrain from conduct prejudicial to the Department's reputation, order, or discipline." Thus, the provision, like the one in *Arnett*, targets the conduct of Fire Department employees, not their speech. Moreover, the Court has reiterated throughout this opinion the government's substantial interest in the discipline and order of its Fire Department. We conclude, therefore, that, subject to the same narrowing construction applied in *Arnett*, the Departmental Reputation Rule survives the plaintiffs' facial challenges.

IV. Conclusion

The efficient functioning of the city's Fire Department is of paramount importance. In order to maintain an effective fire fighting force, the government must be allowed leeway in the decision it makes as an employer to regulate its employees and the working environment. But the First Amendment of the Constitution draws a line where the government's discretion over its employees ends. When the governmental employer targets certain employees for disciplinary action because their speech challenges the Department's preferred viewpoint, it violates the rights guaranteed to all citizens, regardless of their employment status, under the first amendment. A court faced with such improper actions by the government must strike them down.

Therefore, the Court grants the plaintiffs' partial summary judgment motion as it concerns the disciplinary actions of the District of Columbia Fire Department taken against plaintiffs Dypsky, Darmstead, Dowey, Ricker and Lee. The Court does not decide the question of damages. Although the Court is skeptical that the plaintiffs will be able to show that the defendants owe them any material damages, both sides may submit papers on the issue no later than July 30, 1990.

Furthermore, the Court invalidates the Fire Department's Memorandum 38 and Bumper Sticker Regulation on grounds that they violate the first amendment. The defendants are enjoined from enforcing either regulation in the future. An appropriate order is attached.

## ORDER

Upon consideration of Plaintiff's Motion for Partial Summary Judgment and Defendants' Cross–Motion for Summary Judgment, all memoranda in support thereof and opposition thereto, counsels' oral argument, the entire record, and for the reasons set forth in the accompanying opinion, it is by the Court this 13th day of July 1990

ORDERED that the plaintiffs' motion is granted; it is further

ORDERED that Memorandum No. 38 and Article VI, Section 3 of the Fire Department Order Book violate the First Amendment of United States Constitution; it is further

ORDERED that Memorandum No. 38, Article VI, Section 3 and Article VI, Section 4 were unconstitutionally applied to individual plaintiffs Dypsky, Darmstead, Dowey, Ricker and Lee in violation of their first amendment rights; therefore, it is

ORDERED that the defendants are hereby enjoined to:

1. rescind Fire Department Memorandum No. 38 and Article VI, Section 3 of the Fire Department Order Book and cease enforcement thereof;

2. terminate all pending disciplinary proceedings initiated against the individual plaintiffs in which the plaintiffs were charged with violations of either Fire Department Memorandum No. 38 or Article VI, Sections 3 or 4 of the Fire Department Order Book.

3. expunge from the individual plaintiffs' employment records all references to such disciplinary proceedings.

It is further ORDERED that the parties may submit papers on the question of material damages no later than July 30, 1990.