

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE JAN 2 5 2018
Fairhurst, CJ.
CHIEF JUSTICE

at _____ on _____

*SUSAN L. CARLSON*
**SUSAN L. CARLSON**
**SUPREME COURT CLERK**

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | |
|---|---|
| JONATHAN J. SPRAGUE, a married man, ) | No. 93800-8 |
| ) | |
| Petitioner, ) | En Banc |
| v. ) | |
| ) | |
| SPOKANE VALLEY FIRE DEPARTMENT, a ) | Filed ___JAN 2 5 2018___. |
| fire district; MIKE THOMPSON and LINDA ) | |
| THOMPSON, husband and wife, and the ) | |
| marital community composed thereof, ) | |
| ) | |
| Respondents. ) | |
| ) | |

WIGGINS, J.—The Spokane Valley Fire Department (SVFD or Department) fired Captain Jonathan Sprague for persistently including religious comments in e-mails that he sent through the SVFD computer systems and items he posted on the SVFD electronic bulletin board. Sprague sued the Department for violating his First Amendment free speech rights. *See* U.S. CONST. amend. I. The trial court and Court of Appeals declined to address the merits of Sprague's claims, instead concluding that his earlier, unsuccessful appeal to the Spokane County Civil Service Commission (Commission) collaterally estopped his lawsuit.

We reverse. Sprague has met his initial burden to show that SVFD's restrictions on his speech violated the First Amendment. On remand, the burden will shift to SVFD to show by a preponderance of the evidence that it would have reached the same decision as to respondent's employment termination even in the absence of the protected conduct. Nor

does collateral estoppel bar this lawsuit. Accordingly, we remand the case to the superior court for further proceedings consistent with this opinion.

## FACTS AND PROCEDURAL HISTORY

I.   Factual History

Sprague served as a firefighter, and eventually as a captain, for SVFD. During his employment, Sprague and other SVFD employees formed the Spokane County Christian Firefighter Fellowship (Fellowship). Sprague created a list of work e-mail addresses for 46 firefighters[1] that he believed were interested in the Fellowship's activities. Sprague began using SVFD's e-mail system to send e-mails about the Fellowship's activities.

SVFD had a policy governing use of its e-mail system (Policy 171). It stated that the e-mail system was to be used for SVFD business only and "should not be used for personal business." SVFD acknowledged that some personal use of the e-mail system was acceptable, so long as it was "linked" to SVFD business. For example, SVFD would allow an employee to use the e-mail system to arrange for a dog sitter if the employee had to stay late or cover a shift.

In addition to its e-mail system, SVFD maintained an electronic bulletin board as a convenient method to contact all 180 SVFD employees across various firehouses. The record does not contain an official policy governing this bulletin board, but evidence indicated that it was used for a variety of personal business, including selling snow tires, requesting tickets to a concert, or seeking recommendations for a babysitter.

SVFD also provided an employee assistance program (EAP) for the benefit of its employees, administered by SVFD's health insurer. The insurer prepared newsletters for

---

[1] At the time, there was a total of 180 SVFD employees.

2

SVFD employees that touched on various mental health issues and topics like parenting. These newsletters were sent to SVFD employees through SVFD's e-mail system. Newsletters discussed suicide, "caregiver depression" and how to "change your mood," eating disorders, compulsive gambling, binge drinking, and team building.

Sprague contends that the topics discussed in the EAP newsletters were open for discussion via SVFD's e-mail system. SVFD disagrees, claiming that it does not "invite comment or discussion from SVFD employees" on the EAP newsletters. However, SVFD acknowledges that an employee could "respond to a particular EAP e-mail and inform SVFD employees of other resources available on the topics discussed within the EAP newsletters, as well as the time, place, and contact information of the organization or event." Sprague argues this was precisely what he was doing in his e-mails and electronic bulletin board posts that discussed the Fellowship.

Sprague posted information about the Fellowship's meetings and newsletters on SVFD's electronic bulletin board. For example, one bulletin board post discussed the topic of suicide and contained two scriptural quotes.

Sprague sent e-mails through SVFD's system about the Fellowship to his self-compiled e-mail list of other firefighters. One e-mail asked recipients to vote on a logo for the Fellowship. Some logos contained the image of a cross and the phrase "soli Deo gloria," which translates to "glory to God alone." Two additional logos contained the image of a flame.

Other e-mails that Sprague sent over SVFD's e-mail system contained a link to the Fellowship's newsletter, as well as brief messages. The record contains five such messages that Sprague sent over SVFD's e-mail system in 2012. In April, he sent a message

discussing suicide, the Fellowship's logo, supplements, and social activities. In May, Sprague sent out an e-mail with a quote about Christ, which also discussed leadership, suicide, and social activities. In July, Sprague sent an e-mail titled "More discussion about leadership and suicide prevention." In August, Sprague sent an e-mail discussing how teachings from the Bible could help individuals and families deal with difficult situations. Finally, in September, Sprague sent an e-mail about how biblical teachings can help alleviate stress and an update on a previous activity.

These e-mails and postings generated controversy among Sprague's supervisors. They took progressive discipline against Sprague in an effort to halt his communications about the Fellowship on SVFD's e-mail and bulletin board systems. A member of the Spokane Valley Board of Fire Commissioners sent a letter to Sprague, requesting that he stop using SVFD's e-mail system and use his personal e-mail address instead:

> If you wish to send personal emails while on duty (if otherwise permitted under SVFD policy), you may do so using a personal e-mail account (such as Hotmail, Gmail, Yahoo or Comcast account). Using a personal email account, you may only send messages to other personal email accounts. You may not use a personal email account to send messages or solicitations [to] official SVFD accounts.

Sprague did not use his personal e-mail and continued to send e-mails over SVFD's e-mail system. In turn, his supervisors continued their efforts to halt his communications.

SVFD's letters focused on the religious content of Sprague's postings:

> The inappropriate and prohibited behavior involved written content that was of a religious nature, including religious symbols. . . . The inappropriate and prohibited behavior involved the use of language and written content that was of a religious nature, specifically the quotation of scripture.

Valerie Biladeau, SVFD's representative in the lawsuit, testified that the problem with Sprague's e-mails was that they were not "content neutral." She stated that although the

4

"subject language" of Sprague's e-mails was the same as the EAP newsletters, they offered tips "from his interpretation of what [Sprague] had read in the Bible." This was an issue because SVFD "want[ed] to keep everything content neutral to separate church from state because [it is] a state organization." She told Sprague that the "content of the who, where, what, why and when is okay, but [to] please remove the scripture."

Despite his supervisors' continued warnings, Sprague continued to post on the bulletin board and send e-mails about the Fellowship over SVFD's e-mail system. Eventually, Sprague was terminated from SVFD on the recommendation of the fire chief and SVFD's Board of Fire Commissioners. His discharge was a direct result of the e-mails and bulletin board postings, as well as his failure to obey his superiors' orders to cease the communications.

II.   Procedural History

Sprague appealed his termination to the Spokane County Civil Service Commission. Sprague argued that SVFD violated his right to exercise his religion and his right to free speech. The Commission held a hearing in which Sprague and SVFD were represented by counsel, made opening statements, called witnesses, cross-examined them, and presented documentary evidence. Both parties filed posthearing briefs.

The Commission found that SVFD's policies were equally applied to all employees and prohibited the expression of all religious views. The Commission ruled in favor of SVFD and upheld Sprague's termination. Sprague did not appeal the Commission's adverse decision, which became final.

Sprague then filed this action in Spokane County Superior Court. He sued under 42 U.S.C. section 1983, claiming that SVFD violated his First Amendment rights of free speech and free exercise of religion, as well as his equal protection rights under the Fourteenth

5

Amendment.[2] Sprague also claimed that SVFD violated Title VII of the Civil Rights Act of 1991.[3] He made additional state law claims, arguing that SVFD violated his free speech rights, free exercise of religion rights, and equal protection rights under Washington State Constitution article I, sections 5, 11, and 12. Finally, Sprague argued that SVFD discriminated against him on the basis of his religion under RCW 49.60.180 and 49.60.210.

SVFD moved for summary judgment, arguing that the decision of the Commission collaterally estopped Sprague from bringing these claims. Sprague filed a countermotion for partial summary judgment, seeking a declaration that SVFD's policy was unconstitutional. The superior court agreed with the Commission's reasoning that SVFD's policy was not discriminatory because it applied equally to all employees in prohibiting expression of religious views:

> The fire department made a decision that rather than try to parse this out, or just have an open system which allowed for complete discussions of religious issues in connection with fire department issues, they chose not to have any of that type of religious discussion. They were not favoring one position or another. This was truly an "I do not want to go there" type of policy.

Accordingly, the superior court denied Sprague's motion and granted SVFD's motion, finding that Sprague's claims were collaterally estopped by the Commission's hearing. The court also discussed the First Amendment free speech issues at length, concluding that SVFD's policies were "viewpoint neutral." Sprague appealed both the superior court's decision to grant SVFD's motion for summary judgment based on collateral estoppel and the trial court's decision to deny his motion for partial summary judgment that SVFD's policy was unconstitutional.

---

[2] U.S. CONST. amend. XIV.
[3] 42 U.S.C. §§ 1981, 2000.

Division Three of the Court of Appeals heard Sprague's appeal. In a three-way split decision, the Court of Appeals upheld the superior court's grant of summary judgment to SVFD. *Sprague v. Spokane Valley Fire Dep't*, 196 Wn. App. 21, 381 P.3d 1259 (2016). The majority concluded that Sprague's claims were collaterally estopped by two factual findings made by the Commission: (1) "'Sprague was not terminated for religious reasons'" and (2) "'there was no evidence presented . . . that the rules were applied unevenly and with discrimination based upon Sprague's expression of his Christian views.'" *Id.* at 31 (alteration in original). The majority did not reach Sprague's as-applied constitutional challenge to SVFD's policy. *Id.* at 30.

The dissent argued that collateral estoppel did not apply and that, as applied, SVFD's e-mail policy, Policy 171, was likely unconstitutional. *Id.* at 50, 63-64. The dissent would have reversed summary judgment and remanded for a determination of which of Sprague's e-mails overlapped with the EAP newsletter topics and whether or not SVFD could have fired Sprague based on his communications that were outside those topics. *Id.* at 64.

Sprague petitioned this court for review of the trial court's grant of summary judgment to SVFD on the issue of collateral estoppel and for review of the trial court's denial of summary judgment to Sprague on the issue of whether SVFD's policy was constitutional. We granted review on both issues without limitation.

## STANDARD OF REVIEW

We review a trial court's summary judgment decisions de novo. *Scrivener v. Clark Coll.*, 181 Wn.2d 439, 444, 334 P.3d 541 (2014). "Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Id.*; CR 56(c). In such circumstances, this court may grant summary judgment. *See, e.g., In re Estate of Toland*, 180 Wn.2d 836, 854, 329 P.3d 878

7

(2014) (reversing a trial court's grant of summary judgment and granting the opposing party's motion for summary judgment); *LaMon v. Butler*, 112 Wn.2d 193, 199 n.5, 770 P.2d 1027 (1989) ("Washington courts have held many times that summary judgment *should be granted* when reasonable persons, giving all reasonable inferences to the nonmoving party, could only conclude that the moving party is entitled to judgment. In such cases, there is no genuine issue of material fact." (emphasis added)).[4] "Constitutional challenges are questions of law and are also reviewed de novo." *City of Redmond v. Moore*, 151 Wn.2d 664, 668, 91 P.3d 875 (2004). Finally, we review de novo whether collateral estoppel applies. *Christensen v. Grant County Hosp. Dist. No. 1*, 152 Wn.2d 299, 305, 96 P.3d 957 (2004).

## ANALYSIS

As explained below, we reverse the grant of summary judgment to SVFD on the basis of collateral estoppel and conclude that SVFD engaged in viewpoint discrimination. "Although the rejection of one party's cross motion for summary judgment does not compel a court to grant the opposing party's cross motion for summary judgment, we hold that to be the appropriate remedy in this case." *Weden v. San Juan County*, 135 Wn.2d 678, 710, 958 P.2d 273 (1998).

Here, neither party argues before this court that the First Amendment issue should be remanded to the trial court. Instead, all parties argue that they are entitled to judgment on the constitutional issue as a matter of law. Accordingly, the parties recognized in several places that the material facts of the case are undisputed. *See, e.g.*, Clerk's Papers (CP) at 425 ("It is undisputed that Mr. Sprague used SVFD computers and email, public resources,

---

[4] *See also White v. State*, 131 Wn.2d 1, 16-18, 929 P.2d 396 (1997) (affirming summary judgment on an issue where an employee claimed violation of his free speech rights under the First Amendment).

to send and disseminate his personal emails."), 473 ("SVFD does not dispute Sprague's description of its policy.").

In addition, both the Commission and the trial court also recognized that the material facts of the case were undisputed. In its findings and decision, the Commission stated, "The facts relating to this matter are, for the most part, undisputed." *Id.* at 52. In the hearing on the parties' motions for summary judgment, the trial judge stated, "As I indicated in my questioning, it appeared to me in looking at this case that, irrespective of what the parties might think, there is a lot more agreement than there is disagreement." Report of Proceedings (RP) at 45.

Both parties have had multiple opportunities to present evidence on the issues. At the trial court, SVFD and Sprague presented over 100 pages of motions, memoranda, declarations, depositions, and other evidence in response to whether SVFD's application of Policy 171 was unconstitutional. *See, e.g.,* CP at 328-406, 421-58, 467-87. The trial court heard oral arguments from both parties about the constitutional issue and made several findings, including that Policy 171 was viewpoint neutral. RP at 28-38 (discussing Sprague's motion for partial summary judgment that SVFD's policy was unconstitutional), 38-41 (responding to Sprague's arguments that SVFD's policy was unconstitutional), 45-49 (trial court concluding that SVFD's policy was viewpoint neutral). The parties also presented evidence and arguments in many forms before the Commission. CP at 51-53 (noting that the parties had counsel present, made opening statements, called witnesses, presented documentary exhibits, and filed posthearing briefs).

We acknowledge that some of our colleagues would prefer that we direct the trial court on remand to reevaluate all the evidence regarding Sprague's motion for partial

summary judgment that SVFD violated the First Amendment. But a remand to review all the evidence yet again would be redundant and unnecessary. The parties have already presented the evidence to both the Commission and the trial court. RP at 50-51 (trial court's "view is the . . . Commission . . . can make factual findings . . . which may support or not support a constitutional finding. It is just the constitutional finding itself they cannot make. *But they made all the necessary findings to support one and the issue was argued to them.*" (emphasis added)). Sprague's employment was terminated five years ago, and this case was filed almost four years ago. Sprague has gone through a civil service commission hearing and decision, a superior court hearing and decision, a Court of Appeals hearing and decision, and a hearing in this court, and now awaits a decision on his complaint. We are unwilling to prolong these proceedings unnecessarily. Both parties have had ample opportunity to present evidence on whether there are genuine issues of material fact regarding the constitutional issue presented here.

Based on the evidence that the parties have presented, we conclude that there are no genuine issues of material fact regarding whether SVFD engaged in viewpoint discrimination when it applied Policy 171 to Sprague's speech. As a result, we hold that Sprague has met his initial burden to show that SVFD's restrictions on his speech violated the First Amendment. Accordingly, the scope of remand is limited to issues left open by this decision, that is, whether the termination of Sprague's employment was justified and if not, what damages Sprague suffered. We remand these issues to the trial court.

I.  Sprague's First Amendment Rights

The heart of this case is whether SVFD attempted in a viewpoint neutral manner to restrict Sprague's speech. Contrary to the concurrence-dissent's characterization, both

10

parties understood the appeal to encompass consideration of this issue.[5] *Compare* Suppl. Br. of Sprague at 14 ("[T]he trial court erred in failing to grant Sprague's motion for partial summary judgment asking the policy to be declared unconstitutional."), *with* Suppl. Br. of Resp'ts at 7-8 (arguing that if collateral estoppel does not apply, "SVFD's policy is constitutional"). Thus, in addition to the question of collateral estoppel, the other question presented is whether SVFD's restrictions on Sprague's speech were constitutional.[6]

Three United States Supreme Court cases control our analysis of this point: *Lamb's Chapel,*[7] *Rosenberger,*[8] and *Good News Club.*[9] Following the precedent established in those cases, we conclude that SVFD violated Sprague's First Amendment right to free speech when it restricted Sprague's speech that discussed the same topics as the EAP

---

[5] The concurrence-dissent mischaracterizes our holding as one suggesting that use of "government resources to promote specific religious concepts is entirely appropriate, and that any attempt by a government employer to regulate such activity is unconstitutional." Concurrence-dissent at 1-2. We neither hold nor suggest such a position. Both our state constitution and the federal constitution restrict the use of government resources to promote religion. We do not stray from this indisputable fact. Instead, our holding today merely recognizes that when a government permits speech, it may not discriminate against only certain viewpoints—whether those viewpoints are religious or not. This holding is consistent with both state and federal constitutional law restricting the use of government resources in the context of religious messages. Our holding also does not prohibit government employers from taking appropriate action to prevent parties from using government resources in an unconstitutional manner.

[6] The concurrence-dissent takes further issue with our analysis of this claim, arguing that we "ignor[e] a critical, unresolved question of fact" about whether SVFD had an unwritten discriminatory policy. *Id.* at 1. We acknowledge that Sprague characterizes his claim as a challenge to an "unwritten" SVFD policy that prohibited religious speech. *See* Suppl. Br. of Sprague at 7. However, the concurrence-dissent elevates form over substance by concluding Sprague did not challenge Policy 171 at all. Sprague clearly challenges any and all action SVFD took when it restricted his speech. SVFD justified its restrictions as constitutional on the basis of Policy 171 and the establishment clause. *See, e.g.,* Suppl. Br. of Resp'ts at 10-12. Thus, we cannot evaluate whether SVFD's actions were constitutional without also evaluating whether SVFD applied Policy 171 in a viewpoint neutral manner and whether its actions were justified under the establishment clause. As a result, we agree with the way that the Court of Appeals framed the question—as an as-applied challenge to Policy 171. *See Sprague,* 196 Wn. App. at 32-33.

[7] *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.,* 508 U.S. 384, 113 S. Ct. 2141, 124 L. Ed. 2d 352 (1993).

[8] *Rosenberger v. Rector & Visitors of Univ. of Va.,* 515 U.S. 819, 115 S. Ct. 2510, 132 L. Ed. 2d 700 (1995).

[9] *Good News Club v. Milford Cent. Sch.,* 533 U.S. 98, 121 S. Ct. 2093, 150 L. Ed. 2d 151 (2001).

newsletters. While SVFD's policy was reasonable, SVFD applied it to Sprague in a manner that was not viewpoint neutral. SVFD permitted some viewpoints, but excluded Sprague's viewpoint. Also, SVFD's interest in avoiding an establishment clause violation does not outweigh Sprague's interests under the First Amendment. Permitting equal access to a forum does not endorse religion.

However, three factors limit our analysis of whether SVFD's policy violated Sprague's free speech rights. First, although Sprague raised both constitutional and statutory claims, he briefed only his constitutional claims on appeal. We will not consider arguments that a party fails to brief. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 808-09, 828 P.2d 549 (1992). Thus, we do not examine Sprague's statutory claims.

Second, Sprague also failed to adequately brief his claims under the Washington Constitution. He does not cite any law establishing that he has greater protections under the Washington Constitution than under the First Amendment. *See* Suppl. Br. of Sprague at 16. We will not examine whether the Washington Constitution provides greater protection than the United States Constitution unless a party adequately briefs the *Gunwall*[10] factors. *Malyon v. Pierce County*, 131 Wn.2d 779, 791, 935 P.2d 1272 (1997). Therefore, we confine our analysis to whether SVFD's policy violated Sprague's rights under the First Amendment.

Third, although Sprague expressed his religious beliefs, on appeal he relies only on the free speech clause of the First Amendment, not on the exercise of religion clause. *See* Suppl. Br. Sprague at 13. As a result, we address only whether SVFD's policy violated Sprague's free speech rights.[11]

---

[10] *State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808 (1986).
[11] We do not reach the other First Amendment issues in the case, such as whether the accommodations that SVFD offered Sprague, including sending messages via his personal e-mail address, satisfy the exercise of religion clause.

12

*Public Employees Retain Their Free Speech Rights under the First Amendment*

It is well settled that public employees do not surrender their First Amendment rights to speak freely on matters of public concern merely because they are employed by a public entity. *Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S. Ct. 1951, 164 L. Ed. 2d 689 (2006). The "State may not discharge or otherwise discipline an employee on a basis that infringes upon that employee's constitutionally protected interest in freedom of speech." *White v. State*, 131 Wn.2d 1, 10, 929 P.2d 396 (1997).

An employee's right to speak, however, is not absolute. *Id.* The State, as an employer, also has a legitimate interest "'in promoting the efficiency of the public services it performs through its employees.'" *Garcetti*, 547 U.S. at 417 (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968)). The court must perform a balancing test to determine whether the interest of the public employee in speaking on a matter of public concern outweighs the interest of the State in efficiently providing its public services. *Id.*; *White*, 131 Wn.2d at 10.

A public employee's speech will be protected under the First Amendment if it meets two criteria: (1) the employee was speaking as a citizen on a matter of public concern and (2) the employee's interest in speaking outweighs the employer's interest in restricting the employee's speech. *White*, 131 Wn.2d at 11; *see also Garcetti*, 547 U.S. at 418 (requiring a determination of whether an "employee spoke as a citizen on a matter of public concern").

First, the court must decide the threshold issue of whether the employee spoke as a citizen on a matter of public concern. *White*, 131 Wn.2d at 11. This is a question of law.[12] *Id.*

---

[12] The United States Court of Appeals for the Federal Circuit has split regarding whether this is a question of law or a mixed question of law and fact. *See Mayhew v. Town of Smyrna*, 856 F.3d 456, 462 (6th Cir. 2017); *see also Moss v. City of Pembroke Pines*, 782 F.3d 613, 617-18 (11th Cir. 2015).

Second, if the employee spoke as a citizen on a matter of public concern, the court then applies the *Pickering*[13] balancing test to determine whether the employee's interest in speaking outweighed the employer's interest in promoting the efficiency of its operations. *White*, 131 Wn.2d at 11. There are several relevant factors that a court may consider in this analysis:

> (1) the time, place and manner of the employee's speech; (2) whether the statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers; (3) whether the employment relationship is one in which personal loyalty and confidence are necessary; and (4) whether the speech impeded the employee's ability to perform daily responsibilities.

*Id.* at 15 (citation omitted). An employer need not show actual disruption, and the court may defer to an employer's predictions of harm. *Id.*

"Generally, when a free speech challenge arises in regard to activity on property owned and controlled by the government, a court will engage in a 'forum analysis' to determine the level of judicial scrutiny that applies [to the restriction]." *Bradburn v. N. Cent. Reg'l Library Dist.*, 168 Wn.2d 789, 813, 231 P.3d 166 (2010). Traditionally, there are three different kinds of forums in which a government may restrict speech: public forums, limited public forums, and nonpublic forums.[14] *Sanders v. City of Seattle*, 160 Wn.2d 198, 209-11, 156 P.3d 874 (2007). Here, the parties agree that SVFD's e-mail system and electronic bulletin board are nonpublic forums.

---

We follow the United States Supreme Court's ruling in *Connick v. Meyers*, which states that the question is one of law. 461 U.S. 138, 148 n.7, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983) ("The inquiry into the protected status of speech is one of law, not fact."); *see also White*, 131 Wn.2d at 11 ("[T]he first inquiry before the court is whether the speech involved is protected by the First Amendment. This is a question of law.").

[13] *Pickering*, 391 U.S. at 568.

[14] *But see* Lyrissa Lidsky, *Public Forum 2.0*, 91 B.U. L. REV. 1975, 1989-91 (2011) (questioning whether there remains a viable analytical line between limited public forums and nonpublic forums).

In nonpublic forums, the employer's interest in regulating speech is highest and receives the least scrutiny. *City of Seattle v. Mighty Movers, Inc.*, 152 Wn.2d 343, 361, 96 P.3d 979 (2004). An employer may restrict employees' speech as long as the restrictions are reasonable and viewpoint neutral. *Id.* (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806, 105 S. Ct. 3439, 87 L. Ed. 2d 567 (1985)). A reasonable restriction "need not be the most reasonable or the only reasonable limitation." *Cornelius*, 473 U.S. at 808. Instead, the employer may create any reasonable restriction to ensure that the forum will be reserved for its intended purpose. *Mighty Movers*, 152 Wn.2d at 361.

However, a reasonable restriction cannot be justified when it "is in fact based on the desire to suppress a particular point of view." *Cornelius*, 473 U.S. at 812. When the government targets particular views taken by speakers on a subject, it violates the First Amendment's requirement of viewpoint neutrality. *Rosenberger*, 515 U.S. at 829. "'[T]he government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject.'" *Lamb's Chapel*, 508 U.S. at 394 (quoting *Cornelius*, 473 U.S. at 806).

With these considerations in mind, we proceed to apply this test to Sprague's case.

1. Sprague Spoke as a Citizen

In *Garcetti*, the Supreme Court held that a public employee's speech merits First Amendment protection only when that employee speaks as a citizen. 547 U.S. at 423-24. Thus, an employee's speech is not protected when that employee speaks pursuant to his or her official duties. *Id.* at 421. Recently, the Court refined this analysis, holding that "[t]he critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, ___ U.S. ___, 134 S. Ct. 2369, 2379, 189 L. Ed. 2d 312 (2014). When determining whether

15

an employee's speech was within the scope of the employee's duties, courts have considered several factors: "the speech's impetus; its setting; its audience; and its general subject matter," *Mayhew*, 856 F.3d at 464, as well as whether the employee confined his communications "within his chain of command," *id.* at 466, and whether the employee spoke in "direct contravention to his supervisor's orders," *Dahlia v. Rodriguez*, 735 F.3d 1060, 1074-75 (9th Cir. 2013). The *Lane* Court also clarified that "the mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech." 134 S. Ct. at 2379. Consequently, the *Garcetti* exception to First Amendment protection "must be read narrowly to encompass speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of her employment, not merely speech that concerns the ordinary responsibilities of her employment." *Alves v. Bd. of Regents of Univ. Sys. of Ga.*, 804 F.3d 1149, 1162 (11th Cir. 2015).

Here, it is clear from the record that Sprague's ordinary duties as an SVFD captain did not include sending e-mails about the Fellowship. Sprague testified that his objective in speaking was fellowship between "people of like-minded faith, just to be an encouragement to everybody." In pursuit of this objective, Sprague discussed the Fellowship and the mental health and well-being of firefighters, including issues of suicide and stress relief. He directly e-mailed 46 firefighters and posted on the electronic bulletin board, which was accessible to 180 SVFD employees. Sprague did not confine his communications to the chain of command; instead he spoke in direct contravention of his supervisors' orders. Sprague's supervisors characterized the e-mails as falling outside the scope of "official SVFD business." CP at 393 ("You may not use department email to post, discuss, or in any way

disseminate communications that are sent of any purpose other than official SVFD business. This means you cannot send messages using you[r] official SVFD email which discuss the Fellowship or any other private purpose."). With this evidence in mind, we conclude that Sprague spoke as a citizen; his e-mails were not sent in the course of his ordinary duties as an SVFD captain.

2. Sprague Spoke on a Matter of Public Concern

Even when a public employee speaks as a citizen, the First Amendment protects only speech that touches on a matter of public concern. *Connick v. Myers*, 461 U.S. 138, 145-49, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983). Whether speech is a matter of public concern is a question of law. *White*, 131 Wn.2d at 11. Topics of public concern include current matters of political or social concern to the community,[15] speech relating to public education,[16] suspected abuse and proper care of nursing home patients,[17] speech concerning the proper

---

[15] *Connick*, 461 U.S. at 146; *see also Johnson v. County of L.A. Fire Dep't*, 865 F. Supp. 1430, 1436 (C.D. Cal. 1994) (concluding that a firefighter's reading of *Playboy* magazine constituted a matter of public concern because it contained "articles relating to politics, sports, arts and entertainment," as well as "stories by prominent authors and interviews with public figures"); Stephen Allred, *From Connick to Confusion: The Struggle to Define Speech on Matters of Public Concern*, 64 IND. L.J. 43, 50 (1988) ("a category of cases in which the speech clearly constitutes a matter of public concern . . . involve speech on an issue of current community debate"); Helen Norton, *Constraining Public Employee Speech: Government's Control of Its Workers' Speech To Protect Its Own Expression*, 59 DUKE L.J. 1, 9 (2009) (noting that a matter of public concern is "speech that addresses 'a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication'" (quoting *City of San Diego v. Roe*, 543 U.S. 77, 83-84, 125 S. Ct. 521, 160 L. Ed. 2d 410 (2004)).

[16] *Pickering*, 391 U.S. at 571-72; Allred, *supra*, at 65 (stating that issues of education policy constitute matters of public concern).

[17] *White*, 131 Wn.2d at 11-12.

17

functioning of government,[18] and public safety.[19] In contrast, when an employee speaks on a matter of personal interest, such as a personal grievance against his or her employer, the First Amendment does not protect the employee's speech. *See Smith v. Bates Tech. Coll.*, 139 Wn.2d 793, 814-16, 991 P.2d 1135 (2000) (holding that an employee who filed multiple grievances against her employer was not speaking on a matter of public concern).

Only some of Sprague's communications touch on matters of public concern. The e-mails he sent that discuss the mental health and well-being of firefighters, such as issues of suicide and stress relief, relate to public safety and are matters of public concern. Sprague's former boss had recently committed suicide, and SVFD paid for Sprague to take suicide prevention courses. Given this context, it is fair to conclude that the mental health of SVFD firefighters, responsible for protecting the public safety of Spokane County, was likely a matter of particular and current concern to the community at the time of Sprague's e-mails. Other courts have held that similar issues relating to the mental health of firefighters constitute matters of public concern:

> [L]ow morale, even personal discontent among the employees of a fire department can affect the ability of the organization to fulfill its duties in

---

[18] *Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1103 (9th Cir. 2011) (stating that speech dealing with the functioning of government and speech that assists the public in evaluating the performance of public agencies are matters of public concern); *Robinson v. York*, 566 F.3d 817, 823 (9th Cir. 2009) (concluding that speech concerning the misconduct of police officers and an alleged cover-up were matters of public concern); *Johnson v. Multnomah County*, 48 F.3d 420, 425 (9th Cir. 1995) (holding that "misuse of public funds, wastefulness, and inefficiency in managing and operating government entities" are matters of public concern); *Strinni v. Mehlville Fire Prot. Dist.*, 681 F. Supp. 2d 1052, 1072 (E.D. Mo. 2010) (concluding that "criticism of public officials or their policies" are matters of public concern).

[19] *Clairmont*, 632 F.3d at 1104 (holding that "speech exposing policies that put people in jeopardy" is a matter of public interest); *Strinni*, 681 F. Supp. 2d at 1072 (concluding that "public safety issues in terms of the number and qualifications of [firefighters]" is of public concern); *Fire Fighters Ass'n v. Barry*, 742 F. Supp. 1182, 1190 (D.D.C. 1990) (finding that the ability of a fire department to fight fires effectively and protect public safety was a matter of public concern); Allred, *supra* n.11, at 63 (categorizing speech on public safety and welfare as a matter of public concern).

protecting the public safety. And the ability of a fire department to fight fires effectively[ ] is obviously a matter of public concern.

*Fire Fighters Ass'n*, 742 F. Supp. at 1190.

Sprague's e-mails discussing leadership also constitute matters of public concern. Courts have held that speech dealing with the functioning of government, including the efficiency of management and operations of agencies, are matters of public concern. *See, e.g., Clairmont v. Sound Mental Health*, 632 F.3d 1091, 1103 (9th Cir. 2011); *Johnson v. Multnomah County*, 48 F.3d 420, 425 (9th Cir. 1995). This includes criticism of public officials or their policies. *See Strinni v. Melville Fire Prot. Dist.*, 681 F. Supp. 2d 1052, 1072 (E.D. Mo. 2010). The leadership skills of SVFD firefighters certainly has an impact on the efficient operation of firefighting. Again, Sprague's former boss had recently committed suicide and the leadership of SVFD likely was a matter of particular and current public concern. In this environment, some criticism of SVFD management's leadership also was likely to be a matter of public concern, especially if there was a sense that SVFD management could have done or needed to do more to assist firefighters struggling with mental health issues. *See* CP at 84 (SVFD paid for Sprague to take suicide prevention classes, and Sprague joined the department's "intervention team"). Given this context, Sprague's e-mails and posts discussing leadership may be fairly characterized as a matter of public concern.[20]

---

[20] This is not to say that Sprague's e-mails criticizing SVFD leadership were necessarily protected by the First Amendment. In certain circumstances where "personal loyalty and confidence are necessary," the employer's interest in restricting speech may outweigh an employee's interest in speaking. *White*, 131 Wn.2d at 15. A fire department, where employees depend on one another in life-threatening situations, may be such a circumstance. *See Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 834 (8th Cir. 2015) ("'When lives may be at stake in a fire, an *espirit de corps* is essential to the success of the joint endeavor.'" (internal quotation marks omitted) (quoting *Shands v. City of Kennett*, 993 F.2d 1337, 1344-45 (8th Cir. 1993))). We discuss this issue in further detail below.

However, some of Sprague's communications clearly fall outside the scope of public concern. The communications that he sent discussing the Fellowship's social activities and logo design are not matters of public concern. They in no way relate to public safety, the efficiency of government operations, or any other topic of public concern. Consequently, any of Sprague's communications that touched on these topics do not merit protection under the First Amendment, and SVFD was justified in restricting Sprague's speech in those contexts.

3. Sprague's Interest in Speaking Outweighed SVFD's Interests

Having concluded that Sprague's communications discussing the mental health of firefighters and leadership are matters of public concern, we now turn to the *Pickering* balancing test.

Under the *Pickering* balancing test, the court must "balance the interests of the employee against the interests of the employer and . . . determine, as a matter of law, which of those interests is greater." *White*, 131 Wn.2d at 14. The government has a legitimate interest in the "effective and efficient fulfillment of its responsibilities to the public." *Connick*, 461 U.S. at 150. And, in nonpublic forums, such as those at issue here, the government's interest in restricting speech is at its highest. *Cornelius*, 473 U.S. at 799-800. So long as the government's restrictions are reasonable and viewpoint neutral, they are constitutional. *Good News Club*, 533 U.S. at 106-07.

Here, Policy 171, restricting use of the e-mail system to SVFD business, was reasonable. However, SVFD applied Policy 171 to Sprague in a discriminatory manner that was not viewpoint neutral; SVFD permitted the discussion of topics such as suicide, mental health, and team-building over its e-mail system via the EAP newsletters and potential employee discussion, but prohibited Sprague from speaking on these same topics from his religious viewpoint.

*a.* Policy 171 Was Reasonable

The government may permissibly regulate a nonpublic forum so that it remains useful for the purpose to which it is dedicated. *Mighty Movers*, 152 Wn.2d at 360-61. The regulations need not be the most reasonable or the only reasonable limitation. *Id.* at 361. Thus, we must examine whether SVFD's restrictions on its e-mail system and electronic bulletin board were reasonable in light of the purposes that they were intended to serve.

Here, SVFD's e-mail system was intended for "business use related to SVFD." SVFD's restrictions requiring that its employees use the e-mail system only for official SVFD business are clearly rationally related to this purpose. Indeed, Sprague does not appear to contest that Policy 171 was reasonable.

The record does not contain an official policy specifying the purpose of the SVFD electronic bulletin board. SVFD's representative testified that the general purpose was for easily communicating to SVFD's 180 employees across multiple fire stations. Policy 171 also contains a clause specifying that communication over SVFD systems may not be "disruptive, offensive, abusive or threatening." Thus, it appears that the purpose of SVFD's electronic bulletin board was for communicating with all SVFD employees in a manner that was not otherwise disruptive or offensive.

Given this purpose, SVFD's restrictions on Sprague's speech over the SVFD bulletin board are unreasonable. The record reflects that the bulletin board was used for a variety of personal uses, from seeking recommendations for a babysitter to asking whether anyone had any hay for sale. Sprague posted information about Fellowship activities, as well as links to and short descriptions about the Fellowship's topics of discussion. He clearly intended to reach SVFD employees with his communications; he spoke on behalf of or about the

Fellowship, which was created by and consisted of SVFD employees. SVFD presents no evidence that Sprague's communications were otherwise considered "disruptive, offensive, abusive or threatening" beyond the attempts of his supervisors to halt the postings. *See Dougherty v. Sch. Dist.*, 772 F.3d 979, 992 (3d Cir. 2014) (concluding that a court should not "find against an employee where the disruption 'was primarily the result, not of the plaintiff's exercise of speech, but of his superiors' attempts to suppress it'" (quoting *Czurlanis v. Albanese*, 721 F.2d 98, 107 (3d Cir. 1983))); *see also Tucker v. Cal. Dep't of Educ.*, 97 F.3d 1204, 1211 (9th Cir. 1996) (concluding that time spent by supervisors "trying to restrict . . . religious speech does not constitute disruption"). Considering the broad purpose of the SVFD electronic bulletin board for a variety of personal uses relating to SVFD employees, we hold that SVFD's restrictions preventing Sprague from posting about the Fellowship on the bulletin board were unreasonable.[21]

*b.* SVFD Applied Policy 171 in a Manner That Was Not Viewpoint Neutral

Given that SVFD's restrictions on the e-mail system were reasonable, we turn to whether they were viewpoint neutral. A reasonable restriction cannot be justified when it "is in fact based on the desire to suppress a particular point of view." *Cornelius*, 473 U.S. at 812. When the government targets particular views taken by speakers on a subject, it

---

[21] This does not mean that Sprague's posts on the bulletin board were necessarily protected by the First Amendment. SVFD claims that it attempted to restrict Sprague's postings only to the extent that he quoted scriptures or included other religious text. Therefore, it would have been acceptable for Sprague to post the who, what, where, and when of Fellowship activities as long as he did not include other religious elements. This justification for SVFD's restriction does not relate to its reasonableness as much as it relates to SVFD's establishment clause defense. Therefore, we confine our analysis here to the restriction's reasonableness and reserve the discussion of the possible establishment clause justification for the restriction on Sprague's bulletin board postings for discussion in the following pages.

violates the First Amendment's requirement of viewpoint neutrality. *Rosenberger*, 515 U.S.

at 829.

> "[A]lthough a speaker may be excluded from a nonpublic forum if he wishes to address a topic not encompassed within the purpose of the forum . . . or if he is not a member of the class of speakers for whose especial benefit the forum was created . . . , the government violates the First Amendment when it denies access to a speaker solely to suppress the point of view he espouses on an otherwise includible subject."

*Lamb's Chapel*, 508 U.S. at 394 (second and third alterations in original) (quoting *Cornelius*,

473 U.S. at 806).

The United States Supreme Court has decided three cases that control.[22]

First, in *Lamb's Chapel*, the Court held that a school district violated viewpoint

neutrality when it prohibited a church from showing a film series about family issues and

parenting on school property. *Id.* The school property was a limited public forum open only

to certain uses. *Id.* at 386. Among those permissible uses were "'social, civic and

recreational meetings and entertainments, and other uses pertaining to the welfare of the

community,'" as long as the gatherings were nonexclusive and open to the general public.

*Id.* The school had an additional policy prohibiting use of its property for "'religious

purposes.'" *Id.* at 387. Lamb's Chapel, an evangelical church in the community, sought

permission to show a film series on school property. *Id.* The film series featured a "licensed

psychologist, former associate clinical professor of pediatrics at the University of Southern

---

[22] These cases discuss a limited public forum, rather than a nonpublic forum. However, the Court applies the same test to both limited public forums and nonpublic forums, analyzing whether a restriction is reasonable and viewpoint neutral. *Compare Good News Club*, 533 U.S. at 106-07 (applying the reasonable and viewpoint neutral test to a limited public forum), *with Cornelius*, 473 U.S. at 806 (applying the reasonable and viewpoint neutral test to a nonpublic forum); *see also* Lidsky, *supra*, at 1989-91 (noting that the same test applies to limited public forums and nonpublic forums). Thus, the Court's analyses in these limited public forum cases employ the same analysis that we must apply here.

California, best-selling author, and radio commentator" discussing the negative effects of media. *Id.* at 388. The psychologist's theory was that these effects "could only be counterbalanced by returning to traditional, Christian family values instilled at an early stage." *Id.* The district denied the church permission to show the film series solely on the basis that the "presentation would have been from a religious perspective." *Id.* at 394. The Court determined that the school district applied its policies in an unconstitutional manner. *Id.* at 393. Although the film series was permissible as a use benefiting the community and it was open to the general public, the school district refused permission to show it on the basis of its religious viewpoint. *Id.* at 394. As a result, the district violated the First Amendment by attempting to regulate speech in a way that favored some viewpoints or ideas at the expense of others. *Id.*

Second, in *Rosenberger*, the Court held that the University of Virginia violated the First Amendment when it denied funding to a religious student journal. 515 U.S. at 837. The university disbursed money to various student extracurricular organizations from a "Student Activities Fund (SAF)" if they met certain criteria. *Id.* at 824. One university policy qualified "'student news, information, opinion, entertainment, or academic communications media groups'" for SAF funds. *Id.* However, the university denied SAF funds to those organizations that qualified as religious activities.[23] *Id.* at 825. The university denied SAF funds to a student journal, Wide Awake Productions, on the ground that it was a "'religious activity.'" *Id.* at 827. The journal "'offer[ed] a Christian perspective on both personal and community issues, especially those relevant to college students at the University of Virginia.'" *Id.* at 826. The

---

[23] The university defined "religious activity" as "any activity that 'primarily promotes or manifests a particular belie[f] in or about a deity or an ultimate reality.'" *Rosenberger*, 515 U.S. at 825 (alteration in original).

Court concluded that the university engaged in viewpoint discrimination. *Id.* at 832. The university did not prohibit religion as a subject matter, but instead disfavored student journals with a religious editorial viewpoint. *Id.* at 831. The journal discussed otherwise acceptable topics from a religious viewpoint. *Id.* Thus, the university's actions excluding the journal on this basis were unjustified. *Id.* at 831-32.

Third, in *Good News Club*, the Court held that a school engaged in viewpoint discrimination when it excluded a religious club from using its property to hold meetings after school. 533 U.S. at 109. The school permitted groups to hold meetings on its property that were for "'instruction in any branch of education, learning or the arts'" and those "'social, civic and recreational meetings and entertainment events, and other uses [that] pertain[ed] to the welfare of the community,'" so long as the events were nonexclusive and open to the general public. *Id.* at 102. The school prohibited use by any individual or group "'for religious purposes.'" *Id.* at 103. The Good News Club, a religious organization, sought permission to hold meetings after school. *Id.* The club sought to teach morals and character development as discussed in the Bible to children through songs and games. *Id.* at 103, 108 (stating that "no one disputes that the Club instructs children to overcome feelings of jealousy, to treat others well, . . . and to be obedient, even if it does so in a nonsecular way"). The school denied the club permission to meet after school on school property because it was a religious organization. *Id.* Because the school allowed other groups to use its property for the "teachings of morals and character development," but prohibited the club due to its religious nature, the school engaged in viewpoint discrimination. *Id.* at 111-12.

Here, official Policy 171—restricting personal use of SVFD's e-mail system—was viewpoint neutral. However, there is evidence that SVFD did not apply Policy 171 to Sprague

in a viewpoint neutral manner. SVFD opened its e-mail system for discussion of the topics in the EAP newsletters. SVFD forwarded the e-mails over the system and concedes that employee discussion of those topics would be permissible. *See* Br. of Resp'ts at 25 (acknowledging that employees could "respond to a particular EAP email and inform SVFD employees of other resources available on the topics discussed within the EAP newsletters, as well as the time, place, and contact information of the organization or event"). As discussed below, many of Sprague's e-mails touched on the same topics as the EAP newsletters forwarded by SVFD. Therefore, SVFD could not allow discussion of those topics from some viewpoints while excluding Sprague's viewpoint.

Sprague presented evidence that SVFD permitted other firefighters to use the e-mail system for business not related to official SVFD business. For example, e-mails sent over the system discussed fundraisers, social events, and selling tickets to sports events. Yet, the only time that SVFD sought to enforce Policy 171 was to preclude Sprague from sending e-mails about the Fellowship.

SVFD also permitted discussion of team building, and suicide and other mental health issues over its e-mail system via the EAP Newsletters. It concedes that follow-up employee discussion on these topics would be a permissible use of the e-mail system, stating that an employee could "respond to a particular EAP e-mail and inform SVFD employees of other resources available on the topics discussed . . . , as well as the time, place, and contact information of the organization or event." *Id.* Sprague's e-mails discussing suicide, leadership, and stress relief offered a religious viewpoint on the same topics that were in the EAP newsletters.

For example, one EAP newsletter featured the image of a woman meditating and discussed strategies to "Change Your Mood" by providing suggestions to reduce negative and stressful thoughts: use deep breathing exercises, exercise regularly, focus on uplifting and inspiring reading and other activities, and remember with gratitude the positive things in life. Other EAP newsletters discussed suicide and team building.

In comparison, Sprague sent e-mails discussing the same topics. For example, Sprague sent an e-mail with suggestions on how to reduce stress and deal with difficult situations: build a life that will withstand stress and reexamine your life's foundations. He also sent e-mails that discussed suicide and the relationship of leaders and followers. Some of Sprague's e-mails included religious quotes, while others featured secular quotes. Each e-mail provided resources on the relevant topics and/or directed recipients to the Fellowship's newsletter.

Once SVFD opened its e-mail system to discuss reducing negative and stressful thoughts and recalling with gratitude the positive things in life, it could not exclude religious viewpoints. *See Good News Club*, 533 U.S. at 112 (holding that "speech discussing otherwise permissible subjects cannot be excluded from a . . . forum on the ground that the subject is discussed from a religious viewpoint"). "What matters for purposes of the Free Speech Clause is that [there] is no logical difference in kind between the invocation of Christianity . . . and the invocation of teamwork, loyalty, or patriotism by other associations to provide a foundation for their [discussions]." *Id.* at 111. When SVFD sought to halt Sprague's speech, it focused on the religious content of the messages. *See, e.g.*, CP at 382 (letter of reprimand sent to Sprague stating that "[t]he inappropriate and prohibited behavior involved written content that was of a religious nature, including religious symbols."), 385

27

(letter of counseling sent to Sprague stating that "[t]he inappropriate and prohibited behavior involved the use of language and written content that was of a religious nature, specifically the quotation of scripture."), 386 (letter of counseling sent to Sprague stating that "Captain Sprague was directed to cease using SVFD's e-mail system for distribution of documents and messages that contained language that was of a religious nature (citation of scripture). . . . *'You cannot post substantive religious material on either the physical or electronic bulletin boards'*. . . . A subsequent direct order to remove religious content was provided . . . . The continued practice of using scriptural quotes in messages . . . is a violation . . . and was being removed from the system"). Even the notices of discipline that relied on Policy 171 focused on the "clear direction to stop sending e-mails or posting anything on the bulletin board that contained content of a religious nature."

SVFD did not apply Policy 171 neutrally, but selectively applied it to preclude Sprague from expressing his religious viewpoint.

### c. SVFD's Interest in Avoiding an Establishment Clause Violation Did Not Outweigh Sprague's Interest in Speaking

SVFD argues that its focus on and subsequent restriction of Sprague's religious speech was justified, and even constitutionally mandated, to avoid an establishment clause violation.[24] In other words, SVFD argues that as a government employer, its interest in avoiding an establishment clause violation outweighed Sprague's interest in speaking. *See Lamb's Chapel*, 508 U.S. at 394 (recognizing that "the interest of the State in avoiding an Establishment Clause violation 'may be [a] compelling' one justifying an abridgment of free speech otherwise protected by the First Amendment" (alteration in original)). We reject that

---

[24] SVFD concedes that the cost of Sprague's use of the e-mail system "could not be calculated and would be de minimis." *Sprague*, 196 Wn. App. at 48 (Fearing, J., dissenting); *see also* CP at 79 ("Q. Did [Captain Sprague's e-mails] ever cost the department additional funds? A. No.").

defense in this case because permitting Sprague equal access to a government forum does not violate the establishment clause.

When examining a federal establishment clause claim, this court applies the *Lemon*[25] test.[26] *See Erdman v. Chapel Hill Presbyterian Church*, 175 Wn.2d 659, 670-72, 286 P.3d 357 (2012) (plurality opinion). The *Lemon* test has three criteria for evaluating a challenge under the establishment clause:

> "First, the [action] must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion; finally, the [action] must not foster an excessive government entanglement with religion."

*State ex rel. Gallwey v. Grimm*, 146 Wn.2d 445, 471, 48 P.3d 274 (2002) (internal quotation marks omitted) (quoting *Lemon*, 403 U.S. at 612-13).

Here, SVFD focuses on Justice O'Connor's gloss to the *Lemon* test, sometimes referred to as the "endorsement analysis." *See* Steven G. Gey, *Reconciling the Supreme Court's Four Establishment Clauses*, 8 U. PA. J. CONST. L. 725, 737 (2006). Under the endorsement analysis, the first two prongs of the *Lemon* test turn on "whether the government's actual purpose is to endorse or disapprove of religion . . . [and] whether the government intends to convey a message of endorsement or disapproval of religion." *Lynch v. Donnelly*, 465 U.S. 668, 690-91, 104 S. Ct. 1355, 79 L. Ed. 2d 604 (1984) (O'Connor, J., concurring). The government endorses religion when it "sends a message to nonadherents that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.

---

[25] *Lemon v. Kurtzman*, 403 U.S. 602, 91 S. Ct. 2105, 29 L. Ed. 2d 745 (1971).
[26] Over the last 30 years, the United States Supreme Court has articulated 10 different establishment clause standards. Steven G. Gey, *Reconciling the Supreme Court's Four Establishment Clauses*, 8 U. PA. J. CONST. L. 725, 725 (2006).

Disapproval sends the opposite message." *Id.* at 688 (O'Connor, J., concurring). The court assesses whether something may be considered an endorsement through the eyes of a "reasonable observer evaluat[ing] whether a challenged governmental practice conveys a message of endorsement of religion." *County of Allegheny v. Am. Civil Liberties Union*, 492 U.S. 573, 630, 109 S. Ct. 3086, 106 L. Ed. 2d 472 (1989) (O'Connor, J., concurring in part and concurring in judgment).

To evaluate SVFD's establishment clause argument, we turn again to *Rosenberger* and *Good News Club*, as well *Berry v. Department of Social & Health Services*, 447 F.3d 642, 651 (9th Cir. 2006). We conclude that SVFD's establishment clause concerns are chimerical.

In *Rosenberger*, the Court rejected the University of Virginia's contention that granting funding to a religious student journal would violate the establishment clause. 515 U.S. at 845-46. The Court held that "[i]t does not violate the Establishment Clause for a public university to grant access to its facilities on a religion-neutral basis to a wide spectrum of student groups." *Id.* at 842. So long as the university based its policy on a "religion-neutral basis," it was not necessary for the university to deny access to religious groups in order to comply with the establishment clause. *Id.* at 843, 845.

Similarly in *Good News Club*, the Court rejected a school's establishment clause defense. 533 U.S. at 119. Because granting the religious club access to school property "would ensure neutrality, not threaten it," the court held that the school's argument that it might be perceived as endorsing religion was not supported. *Id.* at 114, 117. In fact, the "danger that children would misperceive the endorsement of religion [was not] any greater than the danger that they would perceive a hostility toward the religious viewpoint if the Club

were excluded. . . ." *Id.* at 118. Thus, the countervailing free speech rights of the club outweighed the school's claimed establishment clause defense. *Id.* at 119.

On very different facts, the Ninth Circuit has held that a state agency's interest in avoiding an establishment clause violation outweighed an employee's interest in religious expression in *Berry*, 447 F.3d at 651. Berry worked for a state agency where his official duties involved assisting clients' transition out of welfare programs. *Id.* at 646. As part of his duties, he interviewed clients in his cubicle, where he displayed a Bible and religious messages. *Id.* at 647. His employer told Berry to remove any religious materials out of the view of clients; it did not otherwise prohibit Berry from discussing religion with his coworkers. *Id.* at 646-47. Berry sued his employer, claiming, among other things, a violation of his right to free speech under the First Amendment. *Id.* at 647-48.

The Ninth Circuit held that the state agency's interest in avoiding an establishment clause violation outweighed Berry's free speech rights. *Id.* at 651. The fact that Berry represented the state agency in his client interviews was dispositive. The court concluded that because Berry acted as an agent of the State, clients "may be motivated to seek ways of ingratiating themselves with . . . Berry, or conversely, they may seek reasons to explain a perceived failure to assist them." *Id.* Thus, Berry's display of religious items viewable by clients "[ran] a real danger of entangling the Department with religion." *Id.* Consequently, under the *Pickering* balancing test, the state agency's interest in avoiding the appearance of endorsing a religious message outweighed Berry's interest in displaying religious items in his cubicle, which was "frequented by the Department's clients." *Id.* at 652.

Here, unlike *Berry*, Sprague was not discussing or attempting to discuss religion with members of the public at large. Instead, he sought to share his religious viewpoint on mental

health and leadership topics with some of his coworkers. SVFD permitted discussion of these topics from other nonreligious viewpoints via the EAP newsletters and potential employee follow-up discussions. Permitting Sprague equal access to the forums to discuss the same topics would not violate the establishment clause. *See Rosenberger*, 515 U.S. at 842 (concluding that granting access to a forum "on a religion-neutral basis to a wide spectrum of . . . groups" does not violate the establishment clause). Nor could a reasonable observer perceive SVFD's equal treatment of Sprague's religious speech and other speech as a government endorsement of religion. *See Good News Club*, 533 U.S. at 115. For these reasons, we conclude that SVFD's interest in avoiding an establishment clause violation does not outweigh Sprague's First Amendment rights.

d. SVFD's Other Interests Do Not Outweigh Sprague's Interest in Speaking.

SVFD and amicus, Washington Employment Lawyers Association (WELA), also argue that SVFD's other interests as an employer outweighed Sprague's interest in speaking. Specifically, they argue that Sprague's e-mails were coercive to other employees, that SVFD needed to restrict religious speech in order to prevent discrimination, and that SVFD interests in a loyal employment relationship necessitated and justified the restrictions on Sprague's speech. We disagree for the following reasons.

SVFD relies on Sprague's position as a captain to argue that Sprague's e-mails were coercive to his subordinates. However, Sprague did not send e-mails as part of his official duties as captain, but as a member of the Fellowship, an organization formed by SVFD employees, and as part of a follow-up discussion to topics introduced by SVFD through the EAP newsletters. It does not appear that Sprague triggered SVFD's rules for the line of command when he sent out e-mails in this context.

Nor does the record support SVFD's contention that SVFD employees could not respond or react to Sprague's messages. Sprague solicited feedback from his coworkers, including information from those who did not wish to receive the e-mails. In fact, one employee requested to be removed from the list, and Sprague removed him. The facts simply do not support SVFD's contention that Sprague's position as captain coerced other employees to participate in religious activities. *Cf. Venters v. City of Delphi*, 123 F.3d 956, 970 (7th Cir. 1997) (holding that a police chief coerced a radio dispatcher in violation of the establishment clause by pressuring her to conform her conduct with his religious beliefs and indicating that she would lose her job if she failed to do so).

WELA also argues that because of Sprague's position as captain, SVFD was required to restrict his speech to comply with its duties under relevant nondiscrimination laws. However, WELA focuses on the act of supervisors proselytizing to subordinates. Sprague does not challenge the right of SVFD to adopt a policy restricting the rights of supervisors to proselytize to their subordinates. Neither is such a policy at issue here. Instead, we are concerned with SVFD's policy proscribing discussion from a religious viewpoint on otherwise permissible topics. Such a policy violates, rather than upholds, relevant nondiscrimination laws. *See, e.g.*, RCW 49.60.180 (prohibiting discrimination by an employer on the basis of creed). Nor did SVFD present any evidence that Sprague's communications constituted harassment or led to discrimination of other employees. CP at 359-60 ("Q. Has anyone complained at any point that Jon Sprague is disparaging people? A. No. . . . Q. Okay. And no one complained that he was offending them or being abusive? A. Not that I'm aware of. Q. Or disrupting them or threatening them? A. Not that I'm aware of."), 79 ("Q. At any point did Captain Sprague's alleged activities that led to his discipline, did they ever cause any

disruption in the workplace? A. No."). Consequently, in this case, SVFD's duty under nondiscrimination laws did not outweigh Sprague's interest in speaking.

WELA also questions Sprague's right to send his messages because "[f]irefighters often face life or death situations and depend on each other for their very survival." An employer might justify an abridgment of speech when an employee's "statement would create problems in maintaining discipline by immediate supervisors or harmony among co-workers," or when "the employment relationship is one in which personal loyalty and confidence are necessary." *White*, 131 Wn.2d at 15. Again, there is no evidence that Sprague's statements created an issue of discipline or upset harmony among SVFD employees.

Although SVFD presented no evidence that Sprague created any disciplinary issue, it is reasonable to characterize Sprague's employment relationship with SVFD as one in which loyalty and confidence are necessary—firefighters depend on one another in life-threatening situations. *See Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 834 (8th Cir. 2015) ("'When lives may be at stake in a fire, an *espirit de corps* is essential to the success of the joint endeavor.'" (internal quotation marks omitted) (quoting *Shands v. City of Kennett*, 993 F.2d 1337, 1344-45) (8th Cir. 1993))). An appeal for esprit de corps does not justify an unconstitutional restriction of speech. *See White*, 131 Wn.2d at 10. Because Sprague was speaking on a matter of public concern even when he posted messages that his SVFD supervisors perceived as critical, and given the evidence that Sprague's speech was not disruptive or otherwise harmful, we conclude that Sprague's interest in speaking outweighed SVFD's interest in a loyal employment relationship here. *Cf. Anzaldua*, 793 F.3d at 835-36.

For the foregoing reasons, we conclude that SVFD's interest in preventing religious discrimination and a loyal employment relationship did not outweigh Sprague's First Amendment rights here.

II. Collateral Estoppel

Having concluded that Sprague has met his initial burden to show that SVFD engaged in viewpoint discrimination, we turn to applicability of collateral estoppel to Sprague's case and conclude that collateral estoppel does not bar Sprague's lawsuit for three reasons.

Collateral estoppel, also known as issue preclusion, bars the relitigation of issues that were decided in a previous proceeding involving the same parties. *Christensen*, 152 Wn.2d at 306. The court considers four factors to determine whether collateral estoppel applies:

> "(1) identical issues; (2) a final judgment on the merits; (3) the party against whom the plea is asserted must have been a party to or in privity with a party to the prior adjudication; and (4) application of the doctrine must not work an injustice on the party against whom the doctrine is to be applied."

*Shoemaker v. City of Bremerton*, 109 Wn.2d 504, 507, 745 P.2d 858 (1987) (quoting *Malland v. Dep't of Ret. Sys.*, 103 Wn.2d 484, 489, 694 P.2d 16 (1986)). In addition, the issues to be precluded must have been actually litigated and necessarily decided in the first proceeding. *Id.* at 508. The party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issues in the first proceeding. *Christensen*, 152 Wn.2d at 307.

In addition, when deciding whether to apply collateral estoppel to an administrative proceeding, the court examines three more factors:

> "(1) whether the agency acting within its competence made a factual decision;
> (2) agency and court procedural differences; and (3) policy considerations."

*Shoemaker*, 109 Wn.2d at 508 (quoting *State v. Dupard*, 93 Wn.2d 268, 275, 609 P.2d 961 (1980)).

The parties agree that the Commission's hearing resulted in a final judgment on the merits and that Sprague was a party in that hearing. They focus instead on whether the issues decided by the Commission are identical to the issues presented by Sprague in his lawsuit and whether the application of collateral estoppel would be unjust. The parties also dispute whether the Commission's hearing merits collateral estoppel under the three additional considerations that we apply to administrative proceedings.

SVFD relies on *Shoemaker*, arguing that Sprague's case presents identical issues. In *Shoemaker*, we applied collateral estoppel to a civil service commission's hearing upholding a police officer's demotion after the officer testified concerning irregularities in the police department's performance evaluations. *Id.* at 505-06. He petitioned the City of Bremerton's Civil Service Commission to reverse the demotion. *Id.* at 506. At the commission's hearing, Shoemaker was represented by counsel who gave opening and closing statements, examined and cross-examined witnesses, examined documents, submitted a hearing memorandum, and made objections that the commissioners heard and decided. *Id.*

The Bremerton commission ruled that Shoemaker was not demoted in retaliation for his testimony. *Id.* Shoemaker failed to pursue an appeal of the Bremerton commission's decision. *Id.* at 507. He then filed a civil rights action in the federal district court under 42 U.S.C. section 1983. *Id.* This court held that collateral estoppel barred Shoemaker's federal lawsuit. *Id.* at 513. We reasoned that the procedures of the Bremerton commission justified the application of collateral estoppel, Shoemaker presented identical issues to the Bremerton commission and the federal court, the Bremerton commission made findings of

fact, and the disparity of relief offered in the two venues did not violate public policy or work an injustice. *Id.* at 510-13.

Sprague's case differs from Shoemaker's case in three basic ways[27] that we discuss below—most particularly, it differs because Sprague's underlying claim is a constitutional one for which we grant the Commission no deference. As a result, we decline to apply collateral estoppel to Sprague's case and instead address the constitutional issues that he presents.

First, the *Shoemaker* issues decided by the Bremerton commission are not identical to the issues presented in this case. *See* 109 Wn.2d at 511. The issue in this case is whether SVFD's policy violated the First Amendment by discriminating against Sprague's speech because it included religious discussion and references. This is a speech issue, not a religion issue.[28] Sprague's determination to continue to speak, rather than his religious beliefs, led to his dismissal for insubordination.

The issue before the Spokane County Civil Service Commission was whether Sprague's employment was terminated in good faith "for cause" within the meaning of RCW 41.08.090. The hearing was statutorily limited: "The investigation shall be confined to the determination of the question of whether such removal, suspension, demotion or discharge was or was not made for political or religious reasons and was or was not made in good faith for cause." *Id.* The actual reason for dismissal was Sprague's disobedience to a "direct order

---

[27] In addition, the court noted that the "key question" in *Shoemaker* was whether there were sufficient procedural differences between the Bremerton commission's hearing and the federal lawsuit. 109 Wn.2d at 508-09. In contrast, the key question here is whether the issues presented to the Commission and the superior court are identical. For the reasons discussed below, the constitutional issues of free speech presented to the superior court are not identical to those that the Commission considered.

[28] We do not address whether the actions of the SVFD might give rise to a claim for religious discrimination because Sprague has not raised any such claim before us.

37

of Chief Thompson." The Commission found "[t]he evidence from the investigation and hearing disclosed that Sprague was not terminated for religious reasons" and the evidence further established just cause.

Several factors weigh heavily against SVFD's argument that the issues in this case are the same as the issues before the Commission. First, the Commission is required by RCW 41.08.090 to find whether or not a civil servant was terminated for a religious reason. This strongly suggests that the statute's concern with religious reasons is to protect the free exercise of religion. But here we are concerned with free speech, not free exercise. Second, the actual cause of termination was Sprague's refusal to follow orders that he perceived to be unconstitutional. Third, the Commission misperceived Sprague's claim to be that he was singled out for unfair treatment as compared to adherents of other religions. The Commission reasoned, "No other departmental employees were allowed to express similar religious views using department property, or did so without receiving the same evenly applied discipline or punishment." The Commission missed the thrust of Sprague's claim, which is at issue here: the constitutional violation is not that believers must always be allowed to post religious messages on nonpublic channels of communication. The violation is that SVFD allowed nonreligious postings by other employees but would not allow postings on identical topics if those postings included religious messages.

To the extent that the Commission considered the constitutional questions of free speech at issue here, it did not make a final decision. Nor was the Commission authorized to decide any free speech issues according to the terms of its jurisdictional statute, RCW 41.08.090. RCW 41.08.090 grants the Commission authority to consider only whether termination was for political or religious reasons or if it was made in good faith for cause.

The Commission does not have the competence to make additional legal conclusions, such as whether SVFD violated Sprague's free speech rights. *Shoemaker*, 109 Wn.2d at 511 (stating that the Commission has competence to make factual determinations only). While the Commission noted that it was "fully aware of its additional obligations to follow the law relating to the protections set forth within the First Amendment to the United States Constitution" and it proceeded to lay out the relevant free speech test, it did not decide whether SVFD violated Sprague's free speech rights. Instead, it merely recited relevant precedent without applying that precedent to Sprague's case. This was the proper choice on the part of the Commission, as it did not have the competence to decide whether SVFD complied with the First Amendment. We do not apply collateral estoppel to the free speech issues that the Commission did not, and could not, decide. The free speech questions presented by Sprague have yet to be evaluated in full by any adjudicatory body.

Second, because of the disparity of relief offered by the Commission compared to the relief offered by the court, it would be unjust to apply collateral estoppel to Sprague's claims. When the disparity between the reliefs available creates the risk that "litigants [may] forgo their administrative remedies for fear of preclusion in other, more substantial claims," collateral estoppel is inappropriate. *Shoemaker*, 109 Wn.2d at 513. In the hearing before the Commission, Sprague sought reinstatement. In this lawsuit, Sprague seeks reinstatement, injunctive relief, a declaratory judgment invalidating SVFD's policy, special damages for lost wages and benefits, damages for emotional distress, and punitive damages for the violation of his civil rights. The Commission has authority to order reinstatement only; it cannot provide any of the other forms of relief that Sprague now seeks. RCW 41.08.090 ("The commission . . . may modify the order of removal, suspension, demotion or discharge by

39

directing a suspension, without pay, for a given period, and subsequent restoration to duty, or demotion in classification, grade, or pay . . . ."). Applying collateral estoppel to Sprague's claims in these circumstances creates a negative incentive for terminated public employees to forgo their administrative remedies before the Commission out of fear they will be unable to receive other remedies available from the court.[29]

Finally, public policy considerations support Sprague's lawsuit moving forward. "[T]he relitigation of an important public question of law such as the validity of the . . . ordinance should not be foreclosed by collateral estoppel." *Kennedy v. City of Seattle*, 94 Wn.2d 376, 379, 617 P.2d 713 (1980). Sprague's case presents important issues of state and federal law. The extent to which a public employer may restrict an employee's speech, especially when that speech is religious, is a complex issue affecting over 63,000 Washington state employees. *See* Office of Fin. Mgmt., *Number of Employees and Headcount Trends* (Sept. 3, 2017), https://ofm.wa.gov/state-human-resources/workforce-data-planning/workforce-data-trends/workforce-profile-overview/number-employees-and-headcount-trends [https://perma.cc/VU3Q-2NZ9]. We should not give preclusive effect to agency decisions when they are intertwined with such important constitutional questions. *See Kennedy*, 94 Wn.2d at 379 (holding that an appellate court is the most appropriate forum to decide matters of constitutionality).

Therefore, for the foregoing reasons, we decline to apply collateral estoppel to Sprague's case.

---

[29] This reasoning also falls under the "public policy considerations" factor of our test for analyzing whether collateral estoppel should apply to administrative proceedings. We previously stated that "the injustice factor 'recognizes the significant role of public policy.'" *Christensen*, 152 Wn.2d at 309 (quoting *State v. Vasquez*, 148 Wn.2d 303, 309, 59 P.3d 648 (2002)). Therefore, whether one considers this truly a matter of "injustice" or a matter of "public policy" instead, it supports a finding that collateral estoppel should not apply.

III.  Issues on Remand

To prevail on a wrongful termination claim based on a violation of the First Amendment, an employee must show that his or her conduct was constitutionally protected and that conduct was a "'motivating factor'" in the adverse employment decision. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287, 97 S. Ct. 568, 50 L. Ed. 2d 471 (1977). Once the employee proves these elements, the burden shifts to the employer to show "by a preponderance of the evidence that it would have reached the same decision as to . . . reemployment even in the absence of the protected conduct." *Id.*

Since the speech at issue here was constitutionally protected and a "'motivating factor'" in SVFD's decision to terminate Sprague, we remand to the superior court.[30] *Id.* On remand, the burden will shift to SVFD to show by a preponderance of the evidence that it would have terminated Sprague even in the absence of his protected conduct. *Id.* SVFD must additionally show that Sprague's termination was justified under RCW 41.08.080, which permits the termination of civil service employees like Sprague only upon certain conditions. Assuming that the trier of fact determines that Sprague's termination was not otherwise justifiable, the trier of fact should then determine the applicable amount of damages that Sprague suffered from SVFD's viewpoint discrimination.

## CONCLUSION

In sum, we reverse the superior court's grant of summary judgment to SVFD. While Policy 171 is reasonable, SVFD applied it to Sprague in a manner that was not viewpoint neutral. SVFD permitted some viewpoints, but prohibited Sprague's viewpoint. Here, SVFD's interest in avoiding an establishment clause violation does not outweigh Sprague's

---

[30] The concurrence-dissent incorrectly accuses us of asserting "that no fact-finding is necessary." Concurrence-dissent at 3. We clearly remand for resolution of genuine issues of material fact.

interests under the First Amendment. Permitting equal access to a forum does not endorse religion. Nor did SVFD's other interests as an employer outweigh Sprague's interest in speaking here. There still remain genuine issues of material fact as to whether the termination of Sprague's employment was justified and if not, what damages Sprague suffered. We also hold that collateral estoppel does not bar Sprague's lawsuit; the Commission decided a different issue from the one before us today. Therefore, we reverse and remand to the superior court for further proceedings consistent with this opinion.

_____ Wiggins, J.

WE CONCUR.

_____     _____ Stephens, J.

_____     _____
Madsen, J.                  González, J.

_____     _____
Owens, J.

43

No. 93800-8

YU, J. (concurring in part and dissenting in part) — The majority resolves

petitioner Jonathan Sprague's First Amendment claim as a matter of law by

ignoring a critical, unresolved question of fact: Did Spokane Valley Fire

Department (SVFD) actually have an unwritten electronics communication policy

or practice that discriminated against religious viewpoints? *See* U.S. CONST.

amend. I. I cannot agree that the size of the record or the length of the proceedings

are adequate substitutes for necessary fact-finding. *See* majority at 9-10. I also

cannot join the majority's characterization of SVFD's legitimate concerns about a

supervisor's use of government resources in a government workplace to

promulgate his personal religious views as "chimerical." *Id.* at 30. The majority's

dismissive treatment of SVFD's position suggests a view that using government

resources to promote specific religious concepts is entirely appropriate, and that

any attempt by a government employer to regulate such activity is unconstitutional.

I disagree and therefore respectfully dissent in part.[1]

A government employer may regulate its employees' political or religious

speech at work by implementing policies or practices that restrict a public

employee's use of work e-mail and government resources. Enforcing such policies

does not automatically constitute viewpoint discrimination that offends the First

Amendment. As noted by Judge Lawrence-Berrey, the *Pickering* test "recognizes

that government, in its capacity as an employer, has interests in regulating the

speech of its employees that differ significantly from those it possesses in

connection with regulating the speech of its citizens." *Sprague v. Spokane Valley

Fire Dep't*, 196 Wn. App. 21, 34, 381 P.3d 1259 (2016) (Lawrence-Berrey, J.,

concurring) (citing *Berry v. Dep't of Soc. Servs.*, 447 F.3d 642, 648 (9th Cir. 2006)

(citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S. Ct. 1731, 20 L. Ed. 2d

811 (1968))), *review granted*, 187 Wn.2d 1031, 399 P.3d 1104 (2017). Simply

put, forum matters. And as the majority acknowledges, the fora at issue in this

case (private e-mail and electronic bulletin boards provided by a government

agency) are nonpublic. Majority at 14.

---

[1] I concur in the majority's conclusion that Sprague is not collaterally estopped from pursuing his claims in a court of law. Majority at 35.

2

Nevertheless, Sprague argues that SVFD's restrictions on his use of SVFD's e-mail and electronic bulletin board violated the First Amendment because SVFD allegedly had an unwritten policy or practice that specifically restricted religious speech or singled out Sprague for proselytizing in its effort to curb his use of government resources that prohibited all speech from a religious viewpoint. *See* Suppl. Br. of Jonathan J. Sprague at 7. However, this case was resolved on summary judgment and the record is inadequate to conclude that SVFD in fact had such an unwritten policy or practice. Moreover, despite the majority's assertions that no fact-finding is necessary, Sprague himself "asks this Court to reverse the Court of Appeals decision in all respects, and remand the case for trial." *Id.* at 25.

I would remand for further fact-finding on whether SVFD had an unwritten policy or practice that was specifically hostile to religious viewpoints. I therefore respectfully dissent from the majority's conclusion that the record establishes that SVFD violated Sprague's First Amendment rights as a matter of law.

_____

Fairhurst, CJ.

González, J.